DAVID S. BENNETT et al., Respondents, *v.* LAVINIA AUSTIN, Impleaded, etc., Appellant.

Where a debtor creates or appropriates a fund for the payment of a particular debt or lien, the duty of the holder of the fund is not performed by applying it to the payment of another debt; the debtor has the right to determine as to the application, and to have the application, when made, carried out.

Where a duty rests upon a party in respect to the property of another, the violation or omission of which will result in a sale of the property, and where a sale is made because of such breach of duty, the person owing it is absolutely disqualified from becoming a purchaser at the sale for his own account.

One who, without authority, assumes the management of property in which others are beneficially interested becomes in equity a trustee, by construction for their benefit; and during the continuance of such management is subject to the same rules and remedies as other constructive trustees.

The usual provision in a decree of foreclosure, that any of the parties to the suit may purchase on the sale, will not permit one defendant to bid in premises belonging to another, and to hold them against the latter contrary to equity.

As security for advances made to the firm of B. & A., B. and wife and A. deeded to S. G. A. their interest in certain premises, upon which were two elevators; the wife of B. having a separate interest therein. Prior to this, the said firm had, in connection with the owners of other elevators, entered into an agreement with the W. E. Co., by which they nominally leased their elevators to that company for three years; they, however, retaining possession and operating the elevators, receiving a specified compensation for their services and expenses, and the profits being divided among the several owners. The said firm had also assigned their share in the profits to S. & Co., the holders of a prior mortgage, to be applied in liquidation of the debt secured by the mortgage, and also of prior incumbrances. S. G. A. had full notice of this arrangement when he took his deed; he, thereafter, by setting up the apparent title conferred upon him by his deed, and without the consent of B. & A. or of S. & Co., induced the W. E. Co. to substitute in place of said agreement a new one with him as owner of the elevators, of which he took possession, and he thereafter received and retained the dividends. S. & Co. thereupon foreclosed their mortgage, and by arrangement with them, S. G. A., after judgment, obtained control of the sale, and became the purchaser for the amount of the judgment. In an action to have the deed to S. G. A. declared a mortgage, and to redeem, etc., *held*, that defendant, as devisee of S. G. A., could not, in equity, avail herself of the title obtained on foreclosure sale to defeat plaintiffs' equity of redemption; that B. and wife had the right to have the dividends set apart for the reduction of the mortgage of S. & Co. applied to that purpose; that when S. G. A. possessed himself in the manner specified of said dividends, he became *ex maleficio*, constructively, a trustee of the fund, and the law imposed upon him the duty to apply the dividends to the purpose for which they had been appropriated; and that, therefore, he could not take advantage of his violation of that duty by becoming purchaser in his own behalf, and the purchase did not cut off the right to redeem.

Also, *held*, that B., by not defending the foreclosure, was not concluded from contesting the title obtained under it, as he had no defense to the mortgage; nor was he affected so far as the question here is concerned, by the usual clause in the decree of foreclosure authorizing any party to the action to become a purchaser; and this although the facts as to the assignment of the dividends and the subsequent action of S. G. A. were set forth in the complaint as the foundation of a claim against the latter for the dividends.

S. G. A. was the owner, in his own right, of one-third of one of the elevators. *Held*, that this fact did not change the principle applicable to the case, but would merely reduce the amount which he was bound to apply upon the mortgage of S. & Co.

(Argued March 18, 1880; decided June 8, 1880.)

.APPEAL from order of the General Term of the Supreme Court, in the fourth judicial department, denying a motion for a new trial, made under section 268 of the Code of Procedure.

This action was brought to have a quit-claim deed executed by the plaintiffs, Bennett and wife, and by the defendants, Avery and wife, to Stephen G. Austin, deceased, conveying lands claimed by defendant Lavinia Austin, as devisee under the will of said grantee, declared to be a mortgage, and for an accounting and redemption.

The following facts appeared on trial:

The defendant, Lavinia Austin, is the widow and devisee of Austin; she alone defended. Avery was the nephew of Mrs. Bennett and the son-in-law of Austin. The premises in question are two grain elevators in Buffalo known as the "Bennett" and "Union" elevators, and the land upon which they are situated. Prior to 1869 this property was owned by plaintiffs, Mrs. Bennett having a large and valuable interest as her separate estate. In February, 1869, Bennett and Avery entered into partnership carrying on their business on the premises and docks connected therewith. About the same time Bennett and wife executed to Avery a conveyance of an undivided third part of a portion of the premises. Avery, however, had paid no part of the purchase-price. Bennett and wife, and Avery and wife, by deed dated February 25, 1869, conveyed an undivided third of the premises, where the Union elevator is situated, to Austin. The court found, that of the purchase-price the sum of $22,306.02 remains unpaid. Bennett and Avery, as partners, carried on their general business on the premises, which included the storing and elevating of grain.

Since 1865 the grain elevators in Buffalo have run in combination, the business being carried on in this manner: A general association, called the "Western Elevating Company," took from the different owners of elevators instruments called leases, which, by their terms, or ostensibly, gave to this association the right of possession and control. But by a contemporaneous written contract of the association with the owner of each elevator, the latter was permitted to use and operate his elevator in the ser-

vice of the association at a fixed compensation per bushel intended to pay for such service and expenses. The association gave receipts for grain received, stored and elevated at the different elevators, and received all the profits of the business, which profits it divided among the owners or so called lessors. Thus the business of the " Bennett elevator" alone had been carried on up to 1869, while Bennett and wife were the owners (the Union elevator, a smaller one, being built in 1869). About October 1st, 1869, a new instrument or lease was given by Bennett and Avery and Mrs. Bennett, of the Bennett and Union elevators, to the association, and like leases from all the other elevators were given, for three years. Also contemporaneous contracts were entered into of the kind before mentioned, and the elevating business went on as before under the management of the association. On October 21, 1869, Bennett and wife and Avery and wife executed to Robert Stewart and others, a mortgage upon their interests in both the elevators, to secure the mortgagees for indorsing the notes of the firm of Bennett & Avery to an amount not exceeding $50,000. Mrs. Bennett signed this mortgage as surety in respect to her separate interest in the property. At the same time, and as part of the security, Bennett and wife and Avery executed to the mortgagees a written assignment and pledge of all the profits and dividends which should accrue and belong to the elevators or their owners under the combination lease (so called) and contract aforesaid. The terms of the assignment are as follows: " We do hereby sell, assign and transfer to them all moneys or dividends which shall accrue and belong to said elevators, or the owners thereof, and we do agree with them that all such moneys or dividends shall be paid over to them from time to time by the said Western Elevating Company of Buffalo, and that for that purpose we will make and deliver such order or instruments as may be necessary or convenient to procure the same to be done; the object and intention of this instrument in connection with the said mortgage is to give the said parties the rights of mortgagees in possession, and to give them the right to receive the rents and profits, and to apply them upon

the prior incumbrances, or upon the said promissory notes, as the case may be." At the same time Bennett and wife and Avery gave and delivered to Stewart & Co. a written order on the elevator company, directing the latter to pay over to the assignees such dividends and profits; and this order was immediately deposited with the association, as evidence to it of the destination of such dividends and profits. In January, 1870, Bennett and Avery borrowed of Austin $50,000, and for the purpose of securing the loan the deed in question was.executed and delivered and the same was received by Austin simply as security. Austin, at the time of its execution and delivery, had knowledge of all the facts as to the arrangement with the elevating company and the assignment of the dividends accruing under it to Stewart & Co. A few days after receiving said deed Austin went to the office of the elevating company, claimed the Bennett and Union Elevators as his own, and demanded the dividends to which those elevators were entitled under the arrangement and threatened to take the elevators out of the association if his demand was not complied with. The company thereupon and upon being indemnified canceled the contract with Bennett and Avery and a similar lease and contract with Austin were substituted. Austin also about the same time took possession of the elevators. These. proceedings of Austin were without the consent of Stewart & Co. or of Bennett and wife. Stewart & Co., upon application to the elevating company for a dividend, were advised of the steps taken by Austin and they thereupon commenced a suit for the foreclosure of their mortgage, making Austin a defendant in order to reach the fund he had thus taken; and they got out a preliminary injunction against him with order to show cause and the complaint also asked for a receiver. Austin obtained a stipulation discharging the injunction and the order, and went on as before receiving the elevator dividends. Stewart & Co. proceeded with their foreclosure. No one defended except Austin, who put in an answer setting up usury as the only defense. That defense failed, and Stewart & Co., October 21, 1870, ob-

tained a judgment of foreclosure. It was then agreed between them and Austin that he should place in Stewart's hands, and he did so place, the sum of $40,000 on account of the judgment, which sum Stewart agreed to hold and apply as payment or part payment of the bid, when Austin should bid off the premises at the sale, or in the election of Austin it should be applied without any sale directly to the satisfaction of the judgment; also that Austin should have the control of the sale, and afterward he did control and direct it to take place. The sale was made December 10, 1870, when Austin bid off the premises for the sum of $48,081.68, which was the amount due on the Stewart mortgage, with interest, costs, etc. He received the sheriff's deed. The court found that Austin received during the season of 1870 at least $35,000 by way of dividends or profits and rents from the property in question.

Further facts appear in the opinion.

*Sherman S. Rogers* for appellants. In order to turn the deed to Austin into a mortgage, it must be clearly shown that the conveyance was originally intended to be a security for a loan of money. (*Saxton* v. *Hitchcock,* 47 Barb. 220; *Baker* v. *Thrasher,* 4 Denio, 493; *Hill* v. *Grant,* 46 N. Y. 496; *Fullerton* v. *McCurdy,* 55 id. 637.) A mortgagee in possession occupies no relation to the mortgagor which renders it improper for him to buy in the mortgaged property on an incumbrance, and hold it to his own use. (*Ten Eyck* v. *Craig,* 2 Hun, 452; *Williams* v. *Townsend,* 31 N. Y. 411; *Trimm* v. *Marsh,* 54 id. 599.) Austin's debt being due, he was, as against everybody but Stewart, Graves & Co., entitled to the possession. (1 R. S. 744, part 2, chap. 1, tit. 4, § 3 [Coth. ed., vol. 2, p. 1126].) The sale of the third of the elevator having no connection with the mortgage of the two-thirds the court could not allow the alleged balance unpaid on the purchase of the one-third in this action, even though satisfied that it was not paid. (Story's Eq. Jur., §§ 1433, 1434, 1435, etc.) Austin, on February 2, 1870, the money having been loaned by him and the deed taken, was a mortgagee, holding an instru-

ment subject to all the incidents and containing all the powers of a mortgage. (*Odell* v. *Montross*, 68 N. Y. 499; *Hone* v. *Keteltas*, 46 id. 605; *Van Buren* v. *Olmstead*, 5 Paige, 1.) He was entitled, like any other mortgagee, to hold possession if he could peaceably obtain it. (*Chase* v. *Peck*, 21 N. Y. 581; *Van Denyne* v. *Thayer*, 14 Wend. 233; *Mad. Ave. Ch.* v. *Baptist Ch. in Oliver St.*, 73 N. Y. 82.) Being a mortgagee, and his debt due, the case was one in which the tenant might properly attorn to him. (1 R. S. 744, part 2, chap. 1, tit. 4, § 3 [Coth. ed., vol. 2, p. 1126].)

*Geo. F. Comstock* and *William H. Greene* for respondents. The quit-claim deed of January 28, 1870, having been made, executed and delivered as a security for the payment of a loan, it will operate as a security notwithstanding its terms. (*Stephen* v. *Cushman*, 35 Ill. 88; 2 Lead. Cases in Eq., part 2, p. 432, Hare and Wallace's notes; *Van Dusen* v. *Worrel*, 3 Keyes, 311; *Horn* v. *Keteltas*, 46 N. Y. 605; *Carr* v. *Carr*, 52 id. 251.) The land is the fund to pay all existing liens, and the land is to be deemed and treated as a fund to pay. (7 Paige, 591; 9 id. 649; 10 id. 503; 11 id. 28, 29; 4 Sandf. 516; 1 N. Y. 595; 6 id. 347; 9 id. 73; 12 id. 74; 24 id. 170.) As a purchaser of the equity of redemption, Austin has whatever Bennett and Avery and Mrs. Bennett had not already disposed of. (*Brown* v. *Jackson*, 3 Wheat. 449.) He is not entitled to the protection of a *bona fide* purchaser without notice. (*Van Rensselaer* v. *Kearney*, 11 How. [U. S.] 322; 7 Conn. 250.) His acceptance of the deed and taking possession under it estop him as to the payment of the mortgage to Stewart and Graves. (See 9 Paige, 649; *Freeman* v. *Auld*, 44 N. Y. 50; *Guernsey* v. *Rogers*, 47 id. 233; *Hilton* v. *Bissell*, 1 Sandf. Ch. 407.) He could not make the defense of usury, if the conveyance was subject to the payment of the mortgage debt. (8 Paige, 641; 9 id. 145; 10 id. 591; 2 Denio, 598; 2 Seld. 347.) Mrs. Bennett is entitled to the benefit of the rules which protect her rights as surety from the effects of the acts of Austin. (*Bank of Albion* v. *Barnes*,

46 N. Y. 170.) The owner and lessee of land may divest himself of the covenant to pay rent and all its advantages by sale, assignment or pledge, at the same time retaining all the covenants relating to his title or reversion. (*Demarest* v. *Willard*, 8 Cow. 206; *Willard* v. *Tillman*, 19 Wend. 348; 2 Hill, 274; *Moffatt* v. *Smith*, 4 N. Y. 326; *Childs* v. *Clark*, 2 Barb. Ch. 52.) A trust, or *quasi* trust, attended the collateral assignment or pledge of this fund to the Stewarts. (Brandt on Suretyship, § 384; *Sellers* v. *Nichols*, 22 Penn. St. 423; *Wakeman* v. *Gowdy*, 10 Bosw. 208; *Capel* v. *Butler*, 2 Sim. & Stew. 457; *Barrow* v. *Rhinelander*, 3 Johns. Ch. 615; *Lee* v. *Baldwin*, 10 Ga. 208; *Slevin* v. *Morion*, 4 Ind. 425; *Lamberton* v. *Windom*, 18 Minn. 506.) It was the duty of the Stewarts to hold this collateral faithfully for the purposes of the pledge. Both law and equity utterly ignore the possibility of separating it from the debt to which it was collateral. (*Merritt* v. *Bartholick*, 36 N. Y. 44; 17 Abb. Pr. 342; 11 N. H. 274; 19 Johns. 325.) Austin having become a trustee *ex maleficio*, could not purchase on his own behalf at the foreclosure sale. (Perry on Trusts, § 245; *Van Epps* v. *Van Epps*, 9 Paige, 237; 7 id. 405; 8 Cow. 377, 381; *Fulton* v. *Whitney*, 66 N. Y. 548. When Austin seized and took the fund, he took it impressed with the same trust created by Bennett and Avery and could not hold it otherwise. (*Van Epps* v. *Van Epps*, 9 Paige, 237; *Torrey* v. *Bank of Orleans*, 9 id. 649; *Case* v. *Carrol*, 35 N. Y. 385; *Lytle* v. *Beveridge*, 58 id. 593; *Tiffany* v. *Clark*, id. 632; *Holdridge* v. *Gillespie*, 2 Johns. Ch. 30; *Daroue* v. *Fanning*, 2 id. 252; *Hager's Executors*, 15 Serg. & Rawle, 65, 66; Story's Eq. Jur., § 1257.)

MILLER, J. There was evidence upon the trial of this action to establish that the deed executed by the plaintiffs to Austin, the testator, was given as security for the payment of a loan of money advanced by Austin, for the purpose of aiding the firm of Bennett & Avery in their business, and to relieve them from pecuniary embarrassments, under which they labored at

the time; and the finding of the court, to the effect that the conveyance was an equitable mortgage, was, we think, fully justified by the evidence and should not be disturbed.

We must, therefore, assume at the outset that the title acquired by Austin, by virtue of the quit-claim deed, was not an absolute right, but merely a mortgage security, from which the grantors had a right to redeem the property upon payment of the amount which Austin had advanced with interest, and all legitimate expenses. This brings us to a consideration of the question whether the subsequent acts of Austin, in procuring a deed under a foreclosure sale of the property under the Stewarts' mortgage and otherwise asserting his right to the rents or dividends, and in obtaining possession of the property under the circumstances disclosed by the evidence, were authorized and of such a character as to confer title upon Austin which cut off the right of the plaintiffs to redeem the property. We think that Austin obtained no such title as prevented a redemption by the owners who conveyed to Austin. The claim that Austin had a right to purchase under the foreclosure of the Stewarts' mortgage, and in support of the title acquired thereby and of his proceedings in obtaining possession, is based upon the theory that he was a mortgagee holding an instrument subject to all the accidents and containing all the powers of a mortgage with a debt due, and that he was entitled, like any other mortgagee, to hold possession, if he could peaceably obtain it, and all the rights which are incident to his position as such mortgagee. The right of a mortgagee to the rents of land, without the interposition of the equity power of the court before he has foreclosed the mortgage, depends upon the fact whether the possession is a lawful one, either by consent of the proper party, or by means of legal proceedings. (*Van Duyne* v. *Thayre,* 14 Wend. 236; *Mad. Ave. Bap. Ch.* v. *Oliver St. Bap. Ch.,* 73 N. Y. 94.) The consent must be from the mortgagor or the party who has authority to give such consent. (*Newton* v. *McKay,* 30 Mich. 381; *Russell* v. *Ely,* 2 Black [U. S.], 575.) There is no authority for the doctrine that the mortgagee can go to the lessee and

deprive the lessor of his right to the rents without the consent of the lessor. The actual state of the case was, that the accruing rents or dividends, and the covenant to pay them for a fixed period, had been disposed of by Bennett & Avery by an assignment to the Stewarts, as collateral security to their bond and mortgage, long prior to the period when the deed was executed to Austin; and under the transfer they were to be applied to the payment of the promissory notes indorsed by these parties for the assignors. What right, then, had Austin to rents or dividends which had been especially appropriated for a particular purpose? He took a deed subject to the prior mortgage and the transfer which had been made of the accruing rents and dividends, and had knowledge of this mortgage and of the assignment. The grantors could not, and their conveyance did not, convey any right or interest which had previously been conveyed, and they had no right to make any such conveyance or assignment. The taking of a new lease from Austin by the elevator association was, therefore, without any authority or right, and of itself without force as against the prior assignment. The evidence shows that Austin, on the day after the execution of the quit-claim deed to him, proceeded to the office of the elevating company, demanded the dividends which the elevators had earned under the combination arrangement which had been entered into, and his demand not being acceded to, for the reason stated by the officer in charge, that an order had been made by Bennett & Avery to pay the dividends to the Stewarts; threatened to take the elevators out of the association if he could not have the dividends, and thus break it up. The demand was acceded to upon his executing a bond of indemnity to the company, and the dividends were paid to him, and a new lease or contract entered into between him and the association. The claim of ownership by Austin was unfounded and without any legal right. He was only a mortgagee, and as an assignment had · been made of the lease or the dividends to the prior mortgagee, he had no right to demand and the company no right to pay him the dividends or to make a new contract. It follows that

the attornment by the company to Austin was unauthorized and invalid, and could have no effect whatever upon the rights of the prior mortgagees, or change the appropriation which had been previously made of the rents or dividends.

The claim that the Stewarts, having a prior mortgage, could yield their right to priority to the rents and profits to Austin, as a junior mortgagee, is without merit. The answer to this position is that the Stewarts never did surrender such right, and Austin obtained control over this fund, which had been specially appropriated for a specific purpose, without notice to them or any knowledge of his intention, and immediately afterward they commenced a foreclosure of their mortgage, making Austin a party, obtained an injunction, applied for a receiver, and sought to compel Austin to return the moneys which he had thus unlawfully obtained. They did not surrender in any form to Austin's claim, nor was there any connivance or collusion between the Stewarts and Austin in respect to the same. After a fruitless attempt to defend, on the ground of usury, Austin came to the terms which were demanded by the Stewarts and satisfied their demand. He was in receipt of the dividends — at that time very large — and as he held subject to their mortgage, he could not avoid paying the Stewarts' claim. There was no acquiescence of the Stewarts in Austin's claim, and the fact cannot be denied that Austin did not acquire any hold upon or right to this fund as mortgagee, and his act in obtaining and retaining the same was wrongful and without any lawful authority whatever. The position that whether the Stewarts consented or not was of no importance unless Bennett & Avery had some right to say whether the Stewarts should or should not consent, is not, we think, well founded; for unless the possession of the fund was held by Austin as mortgagee, it was without right, wrongful in itself, and Austin was liable to account for the same to Bennett & Avery, and did not hold as a mortgagee in possession in any sense. Nor is it any answer to the position that Bennett & Avery were the owners, that Austin was entitled to the possession as against the Stewarts ; for as mortgagee he had no

right to such possession unless lawfully acquired, and no claim except as a mortgagee subject to the right of Bennett & Avery to redeem upon payment of his claim.

The discussion thus far relates to the rights of a mortgagee to the rent of the land, and in this connection it may be remarked that the contract with the elevating association, or the lease as it is perhaps inaptly termed, constitutes but one agreement. By this contract the association received the grain delivered, and fixed and collected the charges. The occupancy continued in the owners, who performed the work required by the contract at a compensation agreed upon, and were entitled to the profits realized from the business. The association was merely an agency for the benefit of the owners, to conduct the business under a system which would produce uniformity of charges. The owners remained as occupants and operated the elevators, and could not be ejected or removed without a destruction of the entire agreement. They received or were entitled to the earnings or dividends not as rents, but as profits. The agreement was not a lease and the dividends were not rents. The rent of lands or buildings is such a sum as may be paid and realized from their occupation by tenants, and is fixed and certain, while profits are the result of trade, which is fluctuating and uncertain and dependent upon skill, care and the nature and amount of the business transacted. While then Austin might be liable to account for the profits of the business, which was carried on by himself on the premises and in part in connection with the association, for the reason that he took them unlawfully, he is not chargeable as mortgagee. He was not a mortgagee in possession in any legal aspect, if the principles laid down are sound, as we think is very clear.

The instrument under which the Stewarts claimed the dividends was executed simultaneously with the mortgage executed to them for the purpose of securing the mortgagees for the notes indorsed for the firm of Bennett & Avery, and at the same time with a written order to the elevating association to pay over to the Stewarts the dividends. It was an assignment of these dividends under the contract or lease to secure the in-

dorsements. The clause which confers the rights of mortgagees in possession, and the right to receive the rents and profits, does not necessarily make them such mortgagees. It simply provides that they shall have the same rights as a mortgagee in possession would have to receive and apply the rents and profits of land to the payment of older liens, and that the dividends, although not rents, shall be, for the purposes named, so regarded. The Stewarts never took possession, and their right to the dividends was by virtue of the assignment, and not as mortgagees in possession. They only derived title to them under an express contract, and not otherwise. They had indorsed the notes of Bennett & Avery for a large amount, and the mortgage was given as security and as collateral. An assignment of the receipts which were to accrue from the contract with the elevating company was executed. They were not to be let into possession, although, as we have seen, their rights were to be the same as to the dividends as if they were mortgagees in possession. They in fact never had possession. The assignment separated the rents or dividends from the reversion and the title, and they could have parted with them for a consideration. They were held in trust for the payment of the debt, and the Stewarts could have discharged the mortgage without the debt, retaining the assignment as security. The principle is well established that a lessor or owner of land may assign the rent and the covenant to pay rent without parting with the reversion, or with the reversion, reserving the rent and covenant to payment. (*Demarest* v. *Willard*, 8 Cow. 206; *Willard* v. *Tillman*, 2 Hill, 274; *Moffatt* v. *Smith*, 4 N. Y. 126.)

Bennett & Avery, by the instrument of October 21, 1869, assigned "all moneys or dividends which shall accrue to and belong to said elevators or the owners thereof," as collateral security for the payment of the promissory notes to be indorsed by the Stewarts, but retained their title to the reversion, which they subsequently mortgaged by the quit-claim deed to Austin. He had knowledge of the precise situation, and he only acquired the reversion subject to the assignment to the Stewarts.

The rents or dividends being thus disposed of, separate from the reversion, the assignment or pledge to the Stewarts as collateral to their claim created a trust which they were bound to discharge. By the terms of the assignment they were obligated to apply the moneys received to the payment of the debt, or of the prior incumbrances upon the property. According to a well-settled principle they were also bound to exercise reasonable diligence and care in preserving the fund, and could not waste or dispose of it without being accountable, and if lost, at least by reason of their gross negligence, they encountered the hazard of losing their debt. (Brandt on Suretyship, § 384; *Wakeman* v. *Gowdy*, 10 Bosw. 208; *Barrow* v. *Rhinelander*, 3 Johns. Ch. 615; *Sellers* v. *Jones*, 22 Penn. St. 423; *Lee* v. *Baldwin*, 10 Ga. 208; *Slevin* v. *Morion*, 4 Ind. 425.) The Stewarts were obligated then to hold the collateral faithfully for the purposes for which it was assigned. They could not dispose of it for any other purpose than to carry out the trust, and had no right to separate it from the debt, to secure which it was assigned. (*Merritt* v. *Bartholick*, 36 N. Y. 44.)

The Stewarts never assented to the appropriation of the fund by Austin, and they resisted the arrangement he had made with the elevating association to obtain control over it. He failed in his effort to defend the foreclosure of Stewarts' mortgage and thus get that prior incumbrance out of the way, and under an arrangement to pay the Stewarts, took control of the decree and acquired title in himself. We think he could not thus acquire a hostile title, and he took the dividends under the assignment to the Stewarts as a collateral for the protection of the indorsements and as a trust of which the Stewarts were the trustees. (*Moses* v. *Murgatroyd*, 1 Johns. Ch. 129.)

Austin having thus obtained possession, the inquiry arises whether he could take possession of the fund and pervert it from its original purpose, without incurring any liability, or without being made accountable or chargeable with any obligation or trust under which it was originally created and held by the pledgees. We cannot resist the conclusion, from the circumstances attending the appropriation of the fund by

Austin, and the extraordinary means he employed to obtain possession of tho same, that it did not become separated from the pledge for which it was originally assigned, and that it passed impressed with the trust and charged with the payment of the debt. And although Austin had acquired title under the foreclosure on account of the debt, secured by the mortgage to the Stewarts, he was liable to account, and being in law a wrong-doer, the trust followed the property which he had thus acquired. Equity will not tolerate a separation of the pledge from the debt, and they must stand together, and will force upon a wrong-doer the character of a trustee, and thus compel him to do justice. The rule is laid down in Perry on Trusts that "a person may become a trustee by construction, by intermeddling with and assuming the management of property without authority. Such persons are trustees *de son tort*, as persons who assume to deal with a deceased person's estate without authority are administrators *de son tort*. * * * If one enters upon an infant's lands and takes the rents and profits, he may be charged as guardian or trustee, and so if one takes personal property. * * * During the possession and management by such constructive trustees, they are subject to the same rules and remedies as other trustees." (See § 245, and cases cited in notes.) By attempting to control the fund assigned to the Stewarts, and intermeddling with the same, Austin became a trustee *de son tort*, and as such is liable to the same rule which applies to other trustees.

In *Van Epps* v. *Van Epps* (9 Paige, 237) a person who held a junior mortgage for the benefit of others attempted to purchase for himself the land mortgaged at a sale under the foreclosure of a prior mortgage; and it was held that the act of purchasing was inconsistent with his duty as a trustee to have the sale made at the highest price, while his private interest was to buy as low as he could, and that he could not purchase to the prejudice of the *cestui que trust*. In *Fulton* v. *Whitney* (66 N. Y. 548) the same principle is asserted, and it is said by RAPALLO, J., citing from Chancellor WALWORTH, in *Van Epps* v. *Van Epps, supra:* "The rule is not confined to trustees or

others who hold the legal title to the property to be sold, but applies universally to all who come within its principle, which is that no party can be permitted to purchase an interest in property, and hold it for his own benefit, where he has a duty to perform in relation to such property, which is inconsistent with the character of a purchaser on his own account." Within the doctrine stated, Austin's purchase operated and was for the benefit of Bennett & Avery. He employed all the means at his command to obtain control of the dividends, procured a new contract with the elevating association, and obtained possession in the manner which has been indicated without any lawful right, and thus rendered himself liable to account for the full value of the property. He forced the Stewarts to foreclose, as we have seen, in order to maintain their rights, endeavored to get rid of their mortgage of $50,000, subject to which he took the deed, by a defense which utterly failed, and, after this attempt proved unavailing, bought the property at the foreclosure sale at a very low price. He acquired title after he had unlawfully obtained control of the dividends assigned as security for the amount of the Stewarts' debt. By his own act, and his assumption in seizing and converting the collateral to the debt, he became chargeable with a trust to protect and sacredly guard what he had appropriated, that it might answer the purpose of the trust, and if any thing remained, after the payment of the demand, it might revert to the debtors who had created the fund. His purchase, if lawful, would terminate the contract of Bennett & Avery with the elevating association and destroy the trust as to the dividends. He could not do this as trustee of such rights. In any reasonable view which may be indulged in regard to the attitude of Austin, it cannot be inferred that he purchased otherwise than as trustee of the parties whose interest he represented. He was clearly such when he became possessed, by means of his contract with the association, of the right to the dividends, and his position, in this respect, could not be changed by a purchase at a sale made to pay the debt for which the fund was assigned, in pursuance of an arrangement between himself and the Stewarts, which secured

the payment of their demand. This arrangement was entered into after his defense to the foreclosure suit had proved abortive, and the Stewarts were secured by the payment of a large sum of money ($40,000) in advance, Austin taking control of the sale. Austin then bid off the property and took the title in his own name. This bid was not personal for himself, but for the benefit of the trustee he represented. He could not be a trustee before the sale and immediately afterward a stranger to the trust. A trustee cannot thus get rid of his obligations, discharge the trust and reap the advantages of a sale for himself individually.

It is but just to remark that it does not necessarily follow that he purchased and took the conveyance for the purpose of defrauding Bennett & Avery. As trustee it may have been consistent with his duty to clear up the title and get rid of junior incumbrances. He had a right to purchase in this form, but he could not buy for his own benefit. It is against all ordinary presumptions to suppose that Austin, who had professed to act for the benefit of Bennett & Avery, with a view of relieving them from the pecuniary embarrassment under which they labored, and to save their credit and reputation, and especially that of his own son-in-law, would convert and appropriate this property, which was very valuable, producing large dividends and abundantly ample to pay all debts within a reasonable time, to his own use; entirely wipe out the rights of the grantors by a purchase after a sale upon the foreclosure of a prior mortgage, and after exhausting his remedy against Mrs. Bennett by a foreclosure and sale of her separate interest, hold Bennett & Avery upon their personal obligation — as he had a lawful right to do if his proceedings were fair and lawful, and he did not act in a fiduciary capacity — for the full amount of any deficiency unpaid on the loan. His death prevents any explanation personally, but a liberal interpretation of his conduct, and his declared purpose as proved upon the trial, would indicate that his intention was to protect and preserve the estate after the payment of the incumbrances for the benefit of its owners. His avowed object in

taking the deed was to relieve the owners from the difficulties and troubles which surrounded them. He said to Sherwood, who held a prior mortgage on the elevator property, that he would repay the loan in three years; and the proof shows that he was right in this respect, as it appears that up to July, 1874, he had received large amounts from the dividends, and probably sufficient for this purpose. He kept an accurate account of the profits received, for the purpose, as he declared, of knowing how to make a final settlement. He often said he wanted Bennett to come forward to settle up and redeem. He also received notes from Bennett & Avery, out of the avails of which he paid the taxes upon the property. In view of these acts and declarations, with no avowal to the contrary, it is not unreasonable to suppose that he may have bid in the property to control it more completely and with no object of converting the same to his own use. The court found that he had received $35,000 for rents, income and profits during the season of 1870. This was applicable on the Stewarts' mortgage and the assignment of dividends made to secure the same, thus leaving but a small amount due thereon. And it may well be that he paid it in pursuance of the trust which was created by his assuming control over the dividends, and with the intention that it should be so regarded. Equity will infer a good rather than a bad intention, and that he used the fund which he received for a proper instead of a wrong purpose, and that he acquired title with no improper intention or object in view. But whether the acts of Austin may be regarded as wrongful in taking possession and converting the dividends, or as intended to preserve the fund for the benefit of those entitled to the same, he should be compelled to account for his proceedings as a trustee and to pay to the plaintiffs whatever remains after his debt is liquidated.

So far as Mrs. Bennett is concerned, the considerations presented apply with great force in her favor. She united in a mortgage of her separate estate to secure a debt of Bennett & Avery, for the payment of which she was not originally liable, and thus created a special fund which was placed in trust for

the payment of that debt. It is quite obvious that if Austin improperly appropriated that fund, he cannot use the debt which it was intended to secure to deprive her of her interest in the property. Had he allowed the accruing dividends to be applied on the Stewarts' mortgage, in accordance with the provision made for that purpose, and thus paid the same, as the testimony shows he agreed with them that he would do before he took possession, his rights, as well as those of the other parties, would have been cared for, Mrs. Bennett fully protected, and all would have been paid. By failing to carry out this arrangement, and by purchasing upon the foreclosure of the mortgage, and purchasing at the sale, he became liable to account for the fund. Austin, therefore, is not in a position to claim that he was not prevented from purchasing and holding under the foreclosure deed adversely to the obligations of a trustee created by his own act.

The fact that the debt was due is urged as a reason why Austin was entitled to possession as against every one but the Stewarts. Although it was nominally and strictly due, the testimony shows that it was intended to be paid out of the dividends, and three years were allowed for this. Austin gave as a reason to Sherwood, for asking a forbearance of three years to pay the mortgage of $34,000 held by him against the property, that in that time the business might pay so that they could repay the moneys advanced. As equity has converted the deed into a mortgage, the parol evidence which leads to such a result will be considered in ascertaining the true meaning of the transaction. The contract being ascertained only by parol proof, equity will not permit it to be perverted by a false interpretation of its meaning. The whole matter is one of equitable cognizance, and the written deed which constitutes only a part of the entire transaction will not be permitted to be used in contravention of the real purposes of the parties and for the promotion of fraud and injustice. As such instrument, absolute on its face, is proved by parol to be only a security, equity will not allow it to be enforced except upon such conditions, as to time and circumstances, as are demanded

by good faith and as accord with the understanding and true intention of the parties.

The provision in the judgment of foreclosure, authorizing any party to bid at the sale, is relied upon by the appellant's counsel. Such a provision is common in all decrees in a foreclosure suit, and is usually inserted to enable the plaintiff more particularly to bid at the sale, or to avoid the effect of a supposed technical rule, that a party to the suit cannot be a purchaser under the decree therein without special permission. (*Torrey* v. *Bank of Orleans*, 9 Paige, 661.) It may very properly be inserted where a trustee is a party and it is desired that he should protect the estate, if necessary, from being sacrificed at a sale. It does not appear that this was not a proper provision in regard to the relationship which Austin occupied to the parties as trustee, although such relationship was not a subject of consideration. Be that as it may, the effect of such a provision was considered in *Fulton* v. *Whitney* (66 N. Y. 548), and it was held that on a purchase at a foreclosure sale by one of the defendants who occupied trust relations where the decree contained the same provision, that the title acquired was subject to the trust and all its consequences. It follows, therefore, that Austin could obtain no advantage by reason of this provision in the judgment if, as we have seen, he was acting on behalf of Bennett & Avery and was liable as trustee.

I think that there was no error in the decision of the court that there might be a redemption by the plaintiffs, or either of them, of the entire premises, which would include Avery's interest in the premises covered by the quit-claim deed. Avery refused to join the plaintiffs in seeking to redeem; and as he has not appeared in the case, the complaint must be taken against him as true. He paid nothing for the property, as is alleged in the complaint and admitted by his not interposing any answer, and equity demands that the plaintiffs should be entitled to redeem as against Avery.

It is insisted that it was error in the court to direct that in taking the account, Austin should be charged, and the plaintiffs, or one of them, credited, with the sum of $22,306.02 for

the balance unpaid of the purchase-money of one-third of the Bennett elevator. Without expressing any opinion as to the allowance of this claim, it is sufficient to say that since the argument of this case, the attorney for the respondents has sent a stipulation to be filed with the clerk, that so much of the decision of the court below as relates to this item may be vacated and reversed, without prejudice to the right of either party to have the same allowed or disallowed, as shall appear to be just in the accounting, and further proceedings to be had in the lower courts. There is no objection to a modification of the judgment in conformity with the stipulation, and it should be done accordingly.

Some other questions are presented which it is not necessary to discuss; and our conclusion is that the judgment of the General Term should be affirmed, with the modification contained in the stipulation referred to.

The views expressed in the opinion of RAPALLO, J., delivered since the foregoing opinion was read, in reference to the failure of the plaintiffs to defend the action brought by the Stewarts to foreclose their mortgage, meet with my full concurrence. As, however, the rights of the plaintiffs can be maintained upon the ground that Austin acted as trustee, in my opinion it is not important to consider that aspect of the case.

The judgment should be modified so that it be affirmed as to all thereof except the item of $22,306.02; and as to that item the judgment should be reversed and a trial as to the same ordered on the accounting, with costs to abide the event.

RAPALLO, J. Before Mr. Austin made his advance to Bennett & Avery and received the deed from them and Mrs. Bennett as security, the elevating association dividends had been assigned by them to Stewart & Co. for the specific purpose of being applied to the payment of the notes indorsed by them for Bennett & Avery, for indemnity against which indorsements the Stewart mortgage had been given.. Stewart & Co. were also authorized by the terms of the assignment to apply

the dividends on prior incumbrances, and thus protect their mortgage.

Whether the dividends in question were or were not rents is not very material. The object of the arrangement with the elevating association appears to have been to place the several elevators in Buffalo under a single control and to stock their earnings. For this purpose the owners executed leases of the elevators to the association, who thereby acquired the right of possession, and of sending grain to them for storage and handling, and of receiving the storage. The owners, however, retained the actual possession of the elevators and operated them under contracts with the association, receiving from it a certain amount per bushel for their labor and the expenses of running the elevators. The profits were divided by the association among the several owners, and constituted the dividends in question.

The lease of the elevators now in controversy was for three years from 1869, and, assuming its validity, bound the property for that term.

The Stewarts were not strictly mortgagees in possession, though it was declared in the assignment of the dividends that it was intended to give them the rights of mortgagees in possession to receive the rents and profits. The object of this clause was to confer upon them as perfect a right to receive the dividends as they would have if they were actually in possession and had themselves leased the elevators to the association. Their rights under their mortgage were subject to the existing lease to the association, and they were assignees of the dividends or rents to accrue under that lease. Bennett & Avery retained the actual possession under their agreement with the association, and operated the elevators for the purpose of earning the dividends.

Stewart & Co. had no right to divert these dividends from the purposes for which they were assigned and to which they had thus been specifically appropriated. They could not lawfully have applied them to any other claim which they might have had against Bennett & Avery, nor to the reduction of

junior liens; nor could they rightfully have assigned them independently of their mortgage. If they had done either of these things, equity would, notwithstanding, have applied the amount realized from dividends, to the reduction of the Stewart mortgage, or rather of the liabilities against which the mortgage was designed to indemnify them, and when the sums realized from dividends reached an amount sufficient to satisfy these liabilities, the lien of their mortgage would have been discharged.

The dividends assigned, thus constituted a fund specifically appropriated to the payment of the indorsements secured by the Stewart mortgage.

Bennett & Avery, as well as Stewart & Co., had an interest in the application of this fund to the purpose to which it had thus been appropriated. It stood as a protection to them against the foreclosure of the mortgage. Mrs. Bennett, who in respect to her interest in the property was a mere surety for her husband, had the same equity.

This appropriation being prior in point of time to the mortgage given to Austin, and he having full notice of it when he took his mortgage, his lien was subject to that appropriation, as well as to the lease to the elevating association.

He, without lawful right, but by setting up the apparent title conferred upon him by the deed which he held as security merely, and by indemnifying the elevating association against the claim of Stewart & Co. to the dividends, and by other means hereafter mentioned, obtained possession of the property and of the dividends, withheld them from Stewart & Co., and applied them to his own use, leaving the Stewart lien to accumulate, and thus brought about a foreclosure of the Stewart mortgage. After decree, he, by arrangement with them, obtained control of the sale and became the purchaser, and his devisee now sets up that purchase as a bar to the right of Mr. and Mrs. Bennett to redeem from the mortgage given to him by them in the form of a deed.

The main question on this appeal is whether Austin could

in equity avail himself of a title thus obtained, to defeat the equity of redemption of his mortgagors.

Upon the facts already stated I am of opinion that he could not. There are further facts in the case which require consideration. But the question presented by those now referred to lies at the foundation of the case and must be disposed of before the others are reached.

The grounds of my conclusion on this first and fundamental point are, that when Austin, by his own act, and without the consent of either Bennett and wife or Stewart & Co., but by asserting a title to the premises which he is found not to have had, and by indemnifying the elevator association, possessed himself of the fund in question, it had, to his knowledge, been and then was, lawfully appropriated to keeping down the liabilities secured by the Stewart mortgage. Bennett and wife as well as Stewart & Co. were entitled to have the purpose of that appropriation carried out. It is contended that it was a matter of indifference to Bennett and wife whether the dividends were applied in reduction of the lien of Stewart & Co., or of that of Austin, inasmuch as in either event the dividends went in reduction of the aggregate amount of the incumbrances on the property, and consequently the rights of no one but Stewart & Co. were violated by the diversion, and that Stewart & Co. having been satisfied by the sale of the mortgaged premises, no one now has any right to complain. I think this position fallacious. When Bennett assigned the dividends, he had a perfect right to direct to what purpose they should be applied, and that purpose having been fixed by agreement between him and his assignees, he was entitled to have it carried out until changed with his consent. He did not, by his mortgage to Austin, who took with notice of, and consequently subject to, the assignment of the dividends, consent to any change in their destination. He hypothecated only that which he had not previously disposed of or appropriated, and these dividends he had already appropriated to the payment of his paper indorsed by Stewart & Co. It cannot truly be said that when a debtor creates or appropriates a fund for the payment

of a particular debt or lien, the purpose of the appropriation is carried out, and the duty of the holder of the fund is performed, by applying the fund to the payment of another debt, on the ground that the aggregate indebtedness of the debtor is reduced to the same extent as if the fund had been applied according to its original appropriation. The answer is that the debtor has the right to determine to what debt or lien the fund shall be applied, and to have the appropriation, when legally made, carried out; and it is not for others to judge what different disposition of the fund will be equally to his interest. The right of Mrs. Bennett, who had assigned her interest in the dividends as a mere surety for her husband's debts, to have it applied to the purposes for which she had assigned it,. was indisputable.

Austin knew, when he seized these dividends, that they had been specifically appropriated to the payment of the paper indorsed by Stewart & Co. If, instead of obtaining possession of them in the manner in which he did, they had been assigned to him by Bennett for the express purpose of being applied to the payment of the Stewart notes or mortgage, I apprehend that there would be no difference of opinion between counsel or judges on the point that equity would not have permitted Austin to withhold the dividends from Stewart, and thus bring about a foreclosure of the Stewart mortgage, and then purchase at the foreclosure sale and hold for his own account as against Bennett. The case would then have been analogous to that of a person who, being furnished by the owner of lands with funds to pay the taxes thereon, leaves the taxes unpaid, and on the sale of the lands for the unpaid taxes, himself becomes the purchaser. It has been held that in such a case he cannot hold the property as against his principal, but equity makes him trustee.

The principle which lies at the foundation of this and all similar cases is, that equity will not allow one to profit by a violation of his own duty. Where a duty rests upon a party in respect to the property of another, the violation or omission of which will result in a sale of the property, the person owing

that duty is absolutely disqualified from becoming a purchaser at such sale for his own account. This rule removes all temptation to commit secred frauds whereby persons whose duty it is to protect the property of others may profit by allowing it to be sacrificed, and relieves the injured party from the burden of furnishing proof of actual fraud. It is not confined to cases of express or actual trusts, but applies wherever, either by contract or by law, a person is charged with a duty to another with respect to property, with which duty a design to purchase the same property on the most favorable terms for his own account would be inconsistent. So where one owes a duty to protect a junior mortgage, he cannot purchase the mortgaged premises for his own account on a foreclosure of the senior mortgage, for whatever he may do in the matter should be in the direction of preventing the sale or enhancing the price to be obtained thereon, and the purpose of becoming purchaser for his own account creates an interest hostile to that duty. (*Van Epps* v. *Van Epps*, 9 Paige, 237.) It is not even necessary, in order to disable one from purchasing for his own account, that he be charged with any trust in respect to the identical property which is sold. It is sufficient if the situation is such that a sale of that property for less than its value will diminish another fund which he holds in trust. (*Fulton* v. *Whitney*, 66 N. Y. 548.) In all these cases the disqualifying circumstance is that a design to purchase on his own account creates an interest hostile to his duty to another, and if Austin held the fund in question in trust to keep down the Stewart mortgage, the character of a purchaser on the foreclosure of that mortgage was inconsistent with his duty so to apply the fund as to prevent such foreclosure.

In the present case a duty on the part of Austin to apply the dividends to the payment of the Stewart indorsements was not created by any express contract between Austin and Bennett and wife, but the great question in the case is whether the law did not impose that duty as a consequence of Austin having assumed the management of the property, and possessed himself of the fund arising from the dividends, in the

manner in which he did. If such was the case, the duty was just as imperative as if created by express contract, and the disability to profit by a violation of it, as complete.

It has already been shown that the dividends were expressly appropriated to the purposes stated in the assignment, and that this appropriation was prior to all claims of Austin, and that he had full notice of it. It further appeared in the evidence that before he took his deed from Bennett & Avery he conceded that if he made the advance asked, these dividends would have to be applied, for a time, on the Stewart mortgage. Bennett and wife had an interest in having the purposes of the assignment carried out, and a legal right to their execution.

Such being the position, Austin, immediately after having received the mortgage (in form a deed) from Bennett and wife, without their consent or that of Stewart & Co., applied to the elevating association, and by assuming to be the owner of the elevators, and threatening to take them out of the association if it refused to comply with his demands, and by indemnifying the association against liability to Stewart & Co., obtained the substitution of an agreement between the association and himself for operating the elevators, in place of the subsisting agreement with Bennett & Avery, and thus obtained possession of the elevators, and thereafter Austin and his devisee continued in the possession and management of the property and in the receipt of the dividends, which amounted before the foreclosure sale to a very large sum, and before the commencement of this action to a sum probably sufficient to have paid off the Stewart mortgage and his own.

By thus obtaining, without legal right, the control of the property and of the fund which had been lawfully appropriated to keeping down the Stewart mortgage, I think that Austin assumed, or rather that the law cast upon him, the duty of applying the fund to the purpose to which it had been appropriated, and he became *ex maleficio*, constructively a trustee of the fund for that purpose. One who, without authority, assumes the management of property in which others are beneficially interested, becomes in equity a trustee by construction

for their benefit, and during the continuance of such management is subject to the same rules and remedies as other constructive trustees. (Perry on Trusts, § 245 ; Hill on Trustees, 173.) There are many cases in which this principle has been applied. One somewhat analogous to the present case is *Mulvaney* v. *Dillon* (1 Ball & Beatty, 409). A testator devised certain leasehold estates to his children and left two executors. The defendant, who held farms in the neighborhood and possessed great influence there, wrongfully intermeddled with the property by cautioning tenants not to pay rent to the executors, entered upon the lands and prevented the executors from managing them, and by colluding with one of them and intimidating the other by threats, induced them to surrender the lease to the landlord, and afterward procured a new lease of the same lands to be made to himself. It was held that he was liable to account as trustee, and the children were entitled to the new lease. That by his interference with the property he assumed the position of an executor or trustee, and as such could not take a new lease for his own benefit. The necessity for the application of this principle is greater in the present case than if Austin had obtained control of the fund with the aid or connivance of Stewart & Co., for in that case the Bennetts might have set up against them, as a defense to their foreclosure, their misappropriation of the fund which he had provided for the payment of the liabilities secured by their mortgage. But they were in no way parties to or responsible for such misappropriation. It was brought about by the act of Austin alone, and unless he could be compelled to apply it to the purpose to which it had been dedicated, there was no remedy for his wrong.. That Stewart & Co. might have enforced that application is clear, but he satisfied them, when they asserted their rights, by placing in their hands $40,000, to be applied toward their mortgage if he should elect to pay it off without a sale, or toward the amount of his bid if he should elect to purchase at the foreclosure sale, and they agreed that he should control the sale. This, however, did not help Bennett and wife. The property was left exposed to a sale which

would deprive them of their equity of redemption, if made to a stranger. By the acts of Austin, Bennett and wife were deprived of the protection of the proper application of the fund, which, it may be presumed as against the wrong-doer, would have averted a sale under the Stewart mortgage.

If I am right in the conclusion that Austin became, constructively, a trustee of the fund arising from the dividends, and that it was his duty to apply it to the payment of the Stewart claims, the consequence follows, necessarily, that he could not take advantage of his violation of that duty by becoming purchaser at the foreclosure sale for his own account; and that such purchase did not cut off the right of Bennett and wife to redeem. The argument is that Austin should be allowed the benefit of that sale, because he might have cut off the equity of redemption by a sale under his own mortgage. The circumstance that the Bennetts were thus in his power may have deterred them from taking active measures at the time to compel him to apply the dividends on the Stewart mortgage, but it did not absolve him from his duty to do so. He did not foreclose his own mortgage, but on the contrary, took the position that he had an absolute title under his deed. His devisee, being defeated in that position, cannot sustain the defeasible title, obtained under the Stewart foreclosure, by the claim that he might have obtained an absolute title by the foreclosure of his own mortgage.

It is further contended, that Bennett, by not defending against the Stewart foreclosure, is concluded as to its validity and the title obtained under it. This argument I think untenable. Bennett had no defense against Stewart & Co. As before remarked, the misapplication of the dividends which would have paid their mortgage, was not their act, and did not, consequently, affect the lien of their mortgage. The question here is not as to the validity of the Stewart mortgage, or the propriety, so far as they were concerned, of foreclosing it, but whether Austin, who had become charged with the duty of applying a fund in his hands to the payment of that mortgage, could purchase at a sale, brought about by a wrongful retention

of that fund, and hold for his own account, as against Bennett and wife, to whom the duty to apply it was owing.

Again, it is urged that Bennett & Austin, having both been parties to the foreclosure, and the decree containing the usual clause that any party to the action may become purchaser at the sale, Bennett and wife are estopped, by that provision in the decree, from now questioning the right of Austin to purchase for his own account, and hold as against them. The equities between Bennett and wife and Austin, which are the subject of the present controversy, were not involved, and could not have been passed upon in the Stewart foreclosure suit, and the clause in question had no reference to them. It is true that in the complaint in the foreclosure suit, the facts relative to the assignment of these dividends to Stewart & Co., and the subsequent acts of Austin in respect to them, are set forth, and an injunction and receivership are prayed for as against him. But these allegations are introduced only as the foundation of the claim by Stewart & Co. against Austin, for the dividends. The equities which would arise between Austin, & Bennett and wife, should Austin become the purchaser, were not involved. It would have been foreign to the subject of that action to litigate the matters now in controversy between Bennett and wife and the devisee of Austin, and it would be exceedingly unjust now to hold Bennett and wife concluded by a clause of the decree therein, which simply pursues the ordinary formula of decrees in foreclosure cases. As is said by Chancellor WALWORTH, in *Torrey* v. *The Bank of Orleans* (9 Paige, 661), the provision in a decree of foreclosure, that any of the parties to the suit may become purchaser at the sale, is not intended to permit one defendant to bid in premises belonging to another defendant, and to hold against the latter contrary to equity. It is inserted merely to avoid the effect of a supposed technical rule, that a party to a suit cannot be a purchaser under the decree without special permission. And to this it may be added that it enables the mortgagee, notwithstanding the general rule to the contrary, to purchase at a sale controlled and conducted by himself. The same point was decided in *Fulton* v. *Whitney* (66 N. Y. 548).

It appears that Austin was the owner, in his own right, of one-third of one of the elevators in question. This circumstance does not change the principle to be applied to the case, but would merely reduce the amount which he was bound to apply to the Stewart mortgage.

It is also claimed by the appellant, that the allegations of the complaint show that it was agreed that Austin should receive the earnings of the elevators, to be applied upon his advances; but these allegations are coupled with the further allegation that he was to pay the notes on which Stewart & Co. were indorsers. There is nothing in the complaint or in the evidence, sanctioning the idea that Austin was to receive the earnings, leaving the indebtedness to Stewart & Co. unpaid, and the property exposed to a foreclosure by them. This would have been contrary to the whole spirit of the arrangement, the object of which was to relieve Bennett & Avery from their financial embarrassments.

The testimony of Mr. Sherwood is referred to as showing that Austin required a deed instead of a mortgage, so that he might control the property and collect the dividends. But taking the whole of the testimony of that witness, it shows that Austin conceded, at the same time, that Stewart & Co. had the first lien on the dividends. Mr. Sherwood, the witness, was the holder of prior mortgages on the elevators, amounting to $34,000, and testified that Austin proposed to him to join in making the advance of $50,000 to Bennett & Avery, explaining the urgency of the case and the circumstances of pressure under which Avery, Austin's son-in law, was laboring. That Austin had then present a statement of the earnings of the elevators, showing them to be from $40,000 to $50,000 per annum; and he asked witness to extend the mortgages he held, for three years, saying that within that time Bennett & Avery would be able to pay back the $50,000 they wanted to borrow, out of the earnings, and in the same conversation said that the dividends, for a time, had got to be paid to Stewart & Co.; to go on their mortgage, and that they had an assignment of them. The witness did not join in the loan, but granted the extension

asked, and it was not until after Austin got his deed, that the idea seems to have occurred to him of diverting the earnings from the Stewarts before their lien was satisfied.

It is also urged that no part of the earnings or dividends which accrued before the substitution of the new agreement with Austin were paid over to him by the Elevating Association, and that consequently there was no misapplication of any fund which had been assigned to Stewart & Co. The evidence on this point is not very precise, but we think it justifies the inference that such previously accrued dividends were paid to Austin. It does not appear that any dividends were paid to Stewart & Co., and the testimony of Mr. Sherman, the secretary of the association, is, that Austin came to him and demanded the dividends, and he told him they had an order from Bennett & Avery to pay the dividends to Mr. Stewart; that the president of the association was then called in and made the same answer, and Austin then said, that if he could not have the dividends on his property, he would take it out of the association; that Williams suggested that Austin might give a bond of indemnity, and Austin said he would do that, and the witness testified that he thought it was all paid. The finding of the court is, that on the 2d of February, 1870, Austin took possession of the elevator property, and received the rents and profits of the same, which during the season of 1870 amounted to at least $35,000. Whether these receipts included dividends accruing before Austin took possession, is not stated, nor is it very material. The agreement with the elevating association was for three years, and, assuming its validity, which is not brought in question here, it bound the property for that time. The dividends to accrue under it constituted a fund which was assignable by the parties entitled to receive it, and was separable from the ownership of the land. All subsequent grantees or mortgagees, with notice, were bound by the agreement and assignment, and took subject thereto, and were to that extent deprived of the beneficial enjoyment of the property. The dividends to accrue, whether regarded as rent or otherwise, were as capable of being appropriated to a spe-

cific purpose, as the dividends already accrued, and if a subsequent mortgagee obtained control of them without lawful right, a court of equity was competent to hold him to the obligation of applying them to the purpose to which they had been appropriated. It is contended that the elevating association could have been compelled to pay them according to the original contract, and resort to Austin on his bond of indemnity; but if so, this did not preclude the court from adopting the more direct course, of holding Austin as trustee *ex maleficio* of the fund of which he had assumed control, to the obligation of making the proper application of it and subjecting him to the same consequences as if he had been intrusted with it for the purposes to which it had been dedicated. Although his position as junior mortgagee did not preclude him from acquiring in a fair and lawful manner an outstanding title paramount to that of his mortgagors, yet it did not protect him against any liability or disability which would have ensued from his unlawful assumption of the control of the property, had he not been such mortgagee.

It is not necessary to impute to Mr. Austin any wrongful or dishonest motive in all these transactions. He was not living at the time of the trial and his explanation of them could not, therefore, be heard. It is not unreasonable to suppose, that, notwithstanding his assumption of the control of the property, and his purchase at the foreclosure sale, he did not intend to deny to Bennett and wife the right to redeem if they should become able. He may have been doubtful of their ability to do so, and have desired to exercise full control of the property to protect his advances. The language of his agreement with Stewart & Co., under which he paid them $40,000, is not inconsistent with that theory, for it provided that the money should be applied on the mortgage, if he elected to pay it off without a sale, and on his bid if he purchased at the sale. This shows that he had not at that time finally concluded which course to pursue; and the stipulation that, in case of a sale, he should have control of the sale, was one which a lawyer, as Mr. Austin was, would hardly have deemed it prudent to intro-

duce, if he had contemplated purchasing at the sale, and holding in hostility to his debtors, under the circumstances surrounding this case, though entirely proper if his intention was that their right to redeem should continue.

There are some other matters to be considered on a final disposition of the case, but on the main question I am in favor of affirming the judgment of the Supreme Court.

ANDREWS, J., concurs; EARL, J., concurs in opinion of RAPALLO, J.; FOLGER, Ch. J., and DANFORTH, J., not voting.

Judgment modified in accordance with closing paragraph of opinion of MILLER, J.