# 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉.

## COLES' ADM'R V. BALLARD AND ALS.

### November 6th, 1883.

1. STATUTE OF LIMITATIONS—*War and stay periods—Case at bar.*—Bond executed November 10th, 1844, payable on demand, was not barred when action, brought July 17th, 1877. Under Code 1849, ch. 149, the twenty years' limitation began July 1st, 1850, and was suspended during war and stay periods, from April 17th, 1861, to January 1st, 1869, and had not expired when action was brought.

2. PRESUMPTION OF PAYMENT—*Endorsement of payments.*—Presumption of payment from lapse of time has no reference to the positive bar of the statute, but is repellable by proof, and in case at bar is repelled by testimony of principal objigor, the endorsements of interest payments on the bond, and other circumstances.

3. DECEDENT'S ESTATE—*Distributee—Statute of limitation.*—Limitation of five years within which, under Code 1873, ch. 146, § 16, gifts, assignments, &c., must be assailed, does not protect from liability for decedent's debts his property which has passed into distributee's hands.

4. STALE CLAIMS—*Laches.*—"Laches" is the neglect to do something which a party ought to do, and mere lapse of time, unaccompanied by some circumstance affording evidence of a presumption that the right has been abandoned, is not considered "laches." And claims are considered "stale" only where *gross laches* is shown with unexplained acquiescence in the operation of an adverse right.

5. SURETY—*Creditor—Laches—Heirs—Distributees.*—Surety on bond can never charge creditor with *laches,* until he has in vain prompted the creditor to pursue the principal. It is the surety's business to watch his principal. Creditor need not move till notified. Same is true of surety's heirs and distributees.

6. EQUITABLE JURISDICTION AND RELIEF—*Statute of limitation—Laches and lapse of time.*—If a legal demand which is barred at law be asserted in equity, equity follows the law. If such demand be one to which the statute applies, but the lapse of time be not such as to bring it within the statute, laches and lapse of time cannot of themselves constitute a bar to the suit.

Appeal from decree of circuit court of Albemarle county, rendered 26th June, 1880, in chancery suit wherein Peyton S. Coles,.administrator c. t. a. of Julia Coles, deceased, was complainant and Thomas C. Ballard and the heirs and personal representatives of Valentine Head, deceased, and of Nathaniel Thompson, Jr, deceased, and of Nathaniel Thompson, Sr., deceased, and others were defendants.

Opinion states the facts.

*E R. Watson* and *S. V. Southall*, for the appellant.

*Duke & Duke*, for the appellees.

FAUNTLEROY, J., delivered the opinion of the court.

On the 10th day of November, 1844, the appellant's testatrix, Mrs. Julia Coles, a widow lady, engaged in no business, and living wholly upon her "income from monied investments," loaned to Thomas C. Ballard one thousand dollars, secured by his bond to her of that date, payable on demand, with legal interest thereon till paid, with Valentine Head, Nathaniel Thompson, Jr., and Nathaniel Thompson, Sr., as sureties. Thomas C. Ballard, the principal obligor, paid the interest on said bond *semi-annually*, to the obligee, Mrs. Coles, up to the 10th of June, 1872.

The said Ballard went into bankruptcy in July, 1872; and Mrs. Coles having died in December, 1876, suit was brought on 17th July, 1877, by her administrator, *c. t. a.*, to recover the debt aforesaid, with interest from the 10th of June, 1872, from the heirs and distributees of *two* of his sureties, viz: Valentine Head and Nathaniel Thompson, Jr.

The bill alleged, that Nathaniel Thompson, Sr., the third surety on the said bond, had died, leaving no estate whatever, real or personal; but his heirs and distributees were made parties in the due progress of the suit.

Valentine Head died in 1851, leaving a considerable estate, which he disposed of by will, and the same was sold and distributed under decrees of the circuit court of Albemarle in a suit brought for that purpose in 1852. But it has been more than doubtful whether, at any time since the war, anything could have been made out of the heirs and distributees of said Valentine Head, or any of them.

The other surety in the bond, Nathaniel Thompson, Jr., died in the county of Albemarle, in 1854, intestate, leaving a considerable estate, real and personal, which passed to his three children, William N. Thompson, Mary C. Maupin, who was a widow when her father died, and Susan E. Douglass, then the wife of Thomas M. Douglass.

On the division of the real estate, made in 1855, lot No. 1, containing 254½ acres was allotted to his daughter, Mary C. Maupin, who still holds the same. Lot No. 2, containing 352 acres, was allotted to his son, William N. Thompson, who died intestate, before the institution of this suit, leaving a widow and three infant children, who are still in possession of the said 352 acres of land, and who are parties ot this suit. Lot No. 3, containing 317½ acres, was allotted to Mrs. Susan E. Douglass, who held the same at the institution of this suit, and still holds it—her husband having died in 1870.

The defences relied on were: (1) The statute of limitations; (2) Presumption of payment, arising from lapse of time; and (3). The equitable bar, founded on lapse of time and *laches* of the creditor.

We think it plain that the statute of limitations does not apply. For, though the bond was given and was demandable November 10th, 1884, the right to sue thereon was unquestionable on July 1, 1850; and that right, by § 19, ch. 149 of the Code of 1849 (Code 1873, § 20, ch. 146), was extended for twenty years after July 1, 1850; and deducting from this period the time from 17th April, 1861, to 1st of

January, 1869, during which the running of the statute was suspended (*Connecticut Mutual Life Insurance Company* v. *Duerson's Ex'or*; 28 Gratt. 630–643; *Johnson* v. *Wilson's Adm'r*, 29 Gratt. 379–384), the twenty years had not expired, by six or eight months, when this suit was brought, July 17th, 1877. And it could not apply, for another reason, viz꞉ because of the payments of interest upon the bond made by Ballard, the principal obligor, semi-annually, without fail, up to June 10th, 1872.

But the administrator and counsel for the estate of Thos. M. Douglas, deceased, who was the administrator, and, in right of his wife, a distributee of Nathaniel Thompson, Jr., one of the sureties in the bond to Mrs. Coles, insist that the statute of limitations is a bar to the recovery against Douglas' estate, because this suit was not brought until " more than five years had passed since Thomas M. Douglas had died, and since Micajah Wood had qualified as his administrator." This fact has no relevancy to the question of the statute of limitations, since there is no statute requiring suit to be brought against a decedent's estate, in any case, either at law or in equity, within five years after the death of a co-obligor upon a bond, or after the qualification of his personal representative. And, even as to the personalty received by Thomas M. Douglas, in right of his wife, as one of the distributees of Nathaniel Thompson, Jr., deceased, he is not protected from liability by section 16 of chapter 146 of the Code 1873, which provides that no *bona fide* gift, assignment, &c., shall be set aside, unless suit for that purpose be brought within five years from date thereof, because Thomas M. Douglass did not take as *donee* or *assignee* of Nathaniel Thompson, Jr., in the sense of this statute. Upon the death of Nathaniel Thompson, Jr., " his estate " (in the language of Judge Staples, speaking for the court in the very case cited by the appellee's counsel, *Leake's Ex'or and others* v. *Leake*, &c., 75 Va. R.

805) " passed to his executor or administrator, charged with the payment of his debts, as it was in his hands. No dealing of the executor with the legatees . . would, in any manner, affect or modify this charge. . . The legatee is entitled to nothing until the debts are paid. . . If he receives payment before debts are paid, as is some times done, he takes subject to the condition of making restitution, if it becomes necessary, to satisfy creditors."

Thomas M. Douglas was both administrator and distributee of Nathaniel Thompson, Jr., and having received the assets upon the express trust that he would pay the debts of his intestate before making any distribution, he could not get rid of the trust by settling his accounts and claiming to hold as distributee. As between creditor and legatee there is no statutory period of five years; and the court, in *Leake, &c.* v. *Leake and others,* 75 Va. R. p. 805, speaks of *donees of the debtor,* and says that they may be called on to refund to creditors "within the statutory period." And what the court does say has no reference to this case. The right to make Thomas M. Douglas or his estate refund for the benefit of creditors is not a *legal* right. The rights of creditors of the estate of N. Thompson, Jr., whether against Thomas M. Douglas in his lifetime, or his estate since his death, were purely and solely *equitable;* and there is no "statutory period" which can apply to their rights or remedies.

As to the defence in this case founded on alleged *presumption* of payment, *that* is rebutted by the strongest possible evidence—viz : the deposition of Thomas C. Ballard himself, the principal debtor, and by the production by him of the receipts of Mrs. Coles for the interest on the bond paid by him with unfailing punctuality from 1844 till June, 1872, just before he went into bankruptcy, in July, 1872.

Indeed, it is fully conceded by the appellee that the

*presumption of payment* is rebutted as to Ballard; but the contention is that there is no evidence to rebut it as to his sureties. The fact is the record shows that the sureties in the bond all died before any *presumption* of payment, or of release, or of abatement, could have arisen as to them. It takes *twenty years* to raise such a presumption; and the sureties died, respectively, in 1851, 1854 and 1856— that is to say, within *seven, ten* and *twelve* years after the execution of Ballard's and their joint bond to Mrs. Coles in 1844. And counsel for the appellees say in their brief the "institution of this suit was the first intimation the defendants had that their ancestors (the sureties) had ever executed such an obligation."

Ballard, in his deposition, proves positively that Mrs. Coles had never released or abandoned her claim against the sureties, or been paid by them; for he says: "I saw her in July or August, 1872, when I informed her of my condition; and I think this was the first time that she looked to any other but myself for payment of the said bond." Before that time, Ballard's prompt and regular payment of the interest, *semi-annually*, made it unnecessary for her to call on the sureties.

*Best on Presumptions* (47 Law Library, pp. 119–20, and marginal pp. 187–8) shows that presumption of *release*, as well as of payment, is rebutted by the payment of interest; which, in this case at bar, was made every six months for twenty-eight years.

Mrs. Coles' loan to Ballard was designed as a permanent investment. He was a wealthy man, and the *three* sureties on his bond were all wealthy and thrifty land owners and farmers; and the bond was for only $1,000. Mrs. Coles, in September, 1872, proved this debt, under her oath, in Ballard's bankrupt case.

The delay to sue Ballard, the principal debtor, is fully explained by his prompt and regular payment of interest

up to 1872; and it is not within the bounds of reason to presume that if she had ever been notified by the sureties, or any one of them, or by his personal representative (who make it a part of their defence to this suit that they never heard of the debt) to sue the principal in the bond, she would have failed to sue promptly in obedience to the notice in pursuance of §§ 4 and 5, ch. 144, of the Code of 1873, p. 993. A person prudent enough to take *three* wealthy sureties on a $1,000 bond of a principal worth $20,000, could hardly be so reckless as to surrender all her security by a neglect or refusal to sue. And it is enough to say, that there is not one particle of proof, in the record, of any notice or requirement to her to sue on the bond. But the court below sustained the third and last-named defence— namely, that the claim of the creditor, Mrs. Coles, is too *stale* to be enforced in a court of equity, the court being of opinion that "whilst, under the circumstances, it was proper for the plaintiff to bring this suit to assert his claim, instead of assuming the responsibility of abandoning it, yet that, by reason of the lapse of time and the *laches* of the testatrix, the demand asserted by him is *stale*, and not such as a court of equity ought to enforce against the heirs and distributees of any of the sureties." And the court dismissed the bill.

We think the opinion and decree of the court below were erroneous. This suit was brought in July, 1877, and every six months from the date of the bond in June, 1844, to 1872, the date of Ballard's bankruptcy, Mrs. Coles made a demand for the payment of interest on the bond, which demand, in every instance, was promptly and regularly met. How, then, can the demand made by her administrator in this suit be regarded as a stale demand, when only five years elapsed between the last payment of interest in 1872 and the institution of this suit in 1877? Mrs. Coles' bond in 1877 was an *old* one, but in no sense a *stale* one;

for every six months, with a regularity that is astonishing, it was refreshed by the payment of interest due upon it.

Soon after Ballard's failure in 1872, she placed the bond in the hands of counsel, and they, no doubt, ascertaining that the estates of the sureties had been distributed, and, therefore, not easily reached, determined to see, *first,* what could be realized from Ballard's assets in the bankrupt proceedings; and, these proving unavailing, the administrator of Mrs. Coles instituted this suit. Thomas C. Ballard, the principal obligor, who, of all others, was most interested and best informed as to the transaction, was then living, and not only, when going into bankruptcy before the suit was brought, made a plain and express report of the debt under his oath, but in his deposition, given afterwards, stated fully and clearly that the bond was for money loaned to him; that not one dollar of the principal had ever been paid; that the other obligors were simply his sureties; that he was a man of large means in 1844, and up to the close of the war; that he had paid the interest so regularly and punctually up to June, 1872, that Mrs. Coles, up to that time, had no motive to call for the principal, and no reason to keep herself informed as to whether the sureties were living or dead, or what estates they left, or who were their heirs. There are no accounts to be settled, and no doubt or difficulty as to the exact state, amount or character of the debt, and no " hazard of doing injustice." The " means of explaining the transaction " were as full and complete when Ballard gave his deposition, on 29th January, 1878, as when the bond was given in 1844.

*Bouvier* defines a stale demand to be " a claim which has been for a long time undemanded." It would be an abuse and utter perversion of language, and reason itself, to say that Mrs. Coles was neglecting or sleeping on her rights, whilst the motive for the investment continued in full force, and the interest upon the bond was paid, semi-annu-

ally, with marvelous promptness and regularity, by the principal obligor.

*Laches* is the neglect or omission to do something which the party ought to do; and *mere lapse of time,* unaccompanied by any circumstance to make it to the interest of the creditor to call in the investment, and during all of which time the debtor is scrupulously fulfilling all his obligations, can never amount to such laches or neglect on the part of the creditor as to defeat his rights. In *Nelson* v. *Carrington and als.*, 4 Munford, 332, 343, the doctrine of this court was, "that such lapse is only permitted in equity to defeat an acknowledged right, on the ground of affording evidence of a presumption that that right has been abandoned; that it, therefore, never prevails when that presumption is outweighed by opposing facts and circumstances."

Claims are considered as stale in equity, "only when gross laches is shown, and unexplained acquiescence in the operation of an adverse right." *Godden* v. *Kimmell*, 9 Otto, 201.

In the case at bar, there was no laches, because there was no adverse right, nor even any adverse claim; nor, of course, any acquiescence in any such claims. There was mere *delay*, which, so far from being "*unexplained*," was fully explained; and was most reasonable and proper. The creditor, Mrs. Coles, cannot be charged, justly, with *gross laches*, or even with *negligence* of any kind, prior to June, 1872. Her claim down to that time was not *stale*, nor *antiquated;* she had not slept upon her rights for a day. They were asserted and recognized, twice a year, from 1844 to 1872—only five years before suit was brought by her personal representative—she having died some years previously.

Nor does it alter the case that there were *sureties* concerned. These sureties were simply *joint obligors* with

Ballard, so far as the creditor or obligee, Mrs. Coles, was concerned.

It would be unreasonable and unjust, to hold, that Mrs. Coles was guilty of negligence, of *gross laches*, and had allowed her claim to become stale, because she did not sue the sureties upon it, while, twice a year for 28 years, she demanded and received her interest from the principal obligor in the bond. If, at any time when suit against Ballard, the principal in the bond, would have been available, Mrs. Coles had been *notified* by any one of the sureties, or by his personal representative, to sue upon the bond, in pursuance of § § 4 and 5, ch. 144, of Code 1873, p. 993, and she had refused or failed to do so, she would, thereby, have forfeited her right to demand of such surety or his estate, and all his co-securities and their estates, the money due by the bond.

It was the business of the sureties to take care of themselves; they are *volunteers*, and the law affords them an ample, short and certain means of protection.

In *Sale* v. *Dishman's Ex'ors*, 3 Leigh, 548–554, the bill was filed to recover a partnership demand from the estate of a deceased partner, and the question was raised, whether the creditor had not failed to use due diligence as against the surviving partner, and thereby lost his recourse against the estate of the deceased partner. Judge Tucker, after saying that "the deceased partner was one of two *joint debtors*," adds, that "he was bound to see the debt paid in his lifetime; he was bound to follow his creditor; his creditor was neither bound to look after him, nor to pursue his partner. At his death his obligations ought to devolve with his estate on his representatives; *they* ought to press the payment by the surviving partner, or demand that the creditor should proceed, if danger of his insolvency be apprehended." This would be in strict analogy with the case of the *surety* in a bond, "who can never charge his creditor

with *laches* until he has prompted him in vain to pursue the principal. . . . He is absolved, indeed, by collusion; he is absolved by giving time to the surviving partner, or by new arrangements with him; he may be absolved by failing to sue, when required to do so; but, if there be no such requisition, he is in no sort culpable. This is what is meant by *laches*, in relation to him." *Ibid*, 559–560.

In *Wright's Adm'r* v. *Stockton*, 5 Leigh, 153–160, Judge Carr, for the whole court, says, "The statute makes it the business of the sureties to keep a watch upon their principal; the creditor is not obliged to move until he receives notice." And it is idle to say, that in this respect there can be any difference between the *sureties* themselves, and their heirs and personal representatives. The relations (so far as the contract itself is concerned) between the creditor and the heirs and distributees of each surety, are precisely those which had existed with the surety himself. The demand remains a purely *legal* one; though, indeed, the *remedy*, since the change in the law in 1842, is in equity— (§ 6, ch. 127, Code 1873). No principle is better established, or more uniformly acted on in courts of equity, than that in respect to the statute of limitations—*equity follows the law*—that is to say, if a legal demand be asserted in equity, which at law is barred by statute, it is equally barred in a court of equity; and if not barred by statute at law, neither is it barred in equity. *Rowe* v. *Bentley*, &c., 29 Gratt. 756–759.

Judge Moncure says, in *Foster's Curator* v. *Rison*, &c., 17 Gratt. 321–335, "What I mean to say is, that if the cause of action be one to which the statute applies, but the lapse of time since it accrued be not such as to bring the case within the statute, *laches and lapse of time* cannot, in themselves, constitute a bar to the suit." But, independent of this well settled principle, we do not see that the *equitable bar*, or the rule that courts of equity will not en-

tertain stale demands, can have any application to this case under consideration, because the facts and circumstances of the case do not come within the reason upon which the rule is founded. No reported case has been cited, or can be, we believe, in which the equitable bar has been applied, the facts and circumstances of which do not widely distinguish it from this.

We have examined the leading cases cited by the counsel for the appellees, by the test of the settled principle, that whether a given case is liable to the equitable bar or not, must depend upon its own special circumstances, and we find that these cases are all essentially unlike this case under review; and that they furnish no precedent or authority to justify the denial of the relief asked for in this suit.

We are of opinion that the circuit court of Albemarle erred in dismissing the bill, and the decree complained of must be reversed and annulled.

DECREE REVERSED.