J. F. HAMILTON AND JOHN S. ROHRER, APPEL-
LANTS, *v.* JOHN E. DOOLY, RESPONDENT.

NEW TRIAL—NOTICE—WAIVER OF DEFECTS—LACHES—CONVEYANCE
IN TRUST—SALE—PURCHASE BY TRUSTEE—RIGHTS OF
BENEFICIARIES.

1. Under section 3400, Comp. Laws Utah 1888, only the defeated or
aggrieved party to an action has the right to appeal, and,
when notice of motion for new trial is served within ten days
after notice of the decision of the court, it is in full compli-
ance with section 3402, Id.

2. Where counsel, by stipulation, agreed that the statement on
motion for a new trial was full, true, and correct, and that the
same might be settled by the court, reserving only the objec-
tion that no statement was made within the time provided by
law, and that no order of the court was obtained extending
the time, an objection, raised for the first time in this court,
that the notice was defective, will be regarded as waived.

3. Mere lapse of time, when the parties remain in the same relative
position, and the delay has worked no serious wrong to the
adverse party, so that justice can still be done, although an
important ingredient in the law of laches, will not operate as
a bar in equity.

4. N. mortgaged certain mining property to D., and afterwards con-
veyed the same, with other property, to him by deed absolute
on its face, without consideration except the parol agreement
that D. was to convert the same into money, and out of the
proceeds pay the debts of N., a reasonable compensation to the
trustee, and turn the balance over to the devisees of N. As a
part of the same transaction, N. also made his last will, therein
providing for the same trust, and appointing D. as his exe-
cutor. Afterwards N. died, and D., having assumed his duties
as trustee, also became executor of the estate. At the time of
the above transactions, negotiations for the sale of said min-
ing property to a certain syndicate were pending. One-third
interest in this property had previously been conveyed to N.

by R., who received therefor $3,000 cash, and a note from N. for $47,000. This conveyance was made for the purposes of the sale, and a reconveyance was to be made, and the note canceled, if the sale was not made by a certain date. The third interest was never reconveyed nor the note paid. After the death of N., suits to foreclose miners' liens on the mining property were commenced against D. individually and as executor, but were dismissed as against him as executor, and were consolidated into one suit. D. answered, contesting the liens, and praying that, if the court should decree a foreclosure, his mortgage should be decreed to be a superior lien. A few of the miners' liens were held superior to the mortgage lien, and the property was sold under a decree which contained a clause permitting any of the parties to the suit to bid and become purchasers. The expenses concerning the property, including those incurred in the litigation, were paid out of funds arising through the conveyance from N. to D. At the foreclosure sale, D., through one C., as trustee or agent for him, purchased the said mining property. The negotiations for sale to the syndicate were still going on, and within ten days after the period for redemption had expired it was sold to the syndicate by D. at a large profit. D. refused to account for the profits, claiming that he purchased the property freed from any trust. Thereafter J., a creditor of N., and R., the holder of the $47,000 note, and who had never presented his claim to the executor for allowance, brought suit to establish a trust in their favor against D., and to compel an accounting by him. *Held:* First, that the property which was conveyed by N. to D. became a trust fund, and could not be diverted from the objects of the trust; second, that D.'s position as mortgagee gave him no such interest in the property as to alter his position as trustee, or permit him, without the consent of the *cestuis que* trust to assume any attitude whereby his own interests might be opposed to their interests; third, that D. could not act as trustee up to the time of the sale, then disrobe himself of his fiduciary character, and, with the information obtained while in the trust relation, gain an advantage to himself; fourth, that the court, by dismissing the foreclosure suits against him as executor, could confer no power upon him to gain such advantage; fifth, that D. had no right to speculate with the trust fund, and therefore it was his duty to account to the *cestuis que* trust for the profits of the sale to

the syndicate; sixth, that R., having an equitable claim or interest in the property, could bring suit against the trustee without first presenting the claim to the executor for allowance; seventh, that the provision permitting any party to bid at the sale in the decree of foreclosure did not authorize D. to purchase trust property for his own benefit.

5. Wh, n the circumstances warrant it, a trustee may, by special application to a court of equity, obtain a decree under which he will be entitled to purchase and hold trust property freed from the trust.

6. The general rule is that one who occupies the position of trustee for the benefit of others is incapable of purchasing the trust property, either at a public, private, or judicial sale, for himself. In such case the beneficiaries have the option to affirm, or within a reasonable time set aside, the sale, and in case of affirmance to require an accounting for the profits; and no fraud on the part of the trustee so purchasing need be shown to give the *cestuis que* trust the benefit of the purchase.

(No. 789.   Decided July 26, 1897.)

Appeal from the Third district court, Salt Lake county. Hon. M. L. Ritchie, *Judge.*

Bill by J. F. Hamilton and John S. Rohrer against John E. Dooly.   Decree for defendant, and plaintiff appeals. *Reversed.*

This is a suit in equity, brought to establish a trust in favor of the plaintiffs, and to compel an accounting by the defendant, as trustee, for certain proceeds of the sale of a mine, and for other property which came into his hands as trustee and executor of an estate. It was alleged in the complaint, substantially, that on or about the 20th of June, 1884, one William A. Norton was indebted to the plaintiffs and others, and at that time was, and previous thereto had been, the owner of a large amount of property, including the Charles Dickens mine and mill site; that on or about the same date Norton

conveyed, without consideration, by deed absolute on its face, all of said property to the defendant, but with the trust, as understood by the parties, that the defendant should take charge of the property, convert the same into money, and out of the proceeds pay the debts of Norton, and return any balance to him or his representatives; that the defendant received the property under trust; that the plaintiffs are creditors of Norton; that the defendant received for personal property sold by him about $11,000, and converted the Charles Dickens mine and other property into money, and mingled it with his own; that the amount of the money received for said property was more than sufficient to pay all of Norton's debts, but the defendant retains it, and has failed to apply the same under the trust; and that after repeated demands for payment the plaintiffs' claims remain unpaid. The answer admits the conveyance of the property by Norton, and the trust, but denies, among other things, that the plaintiffs were creditors of Norton or that any of his personal property was sold for any greater sum than $3,254.12, or that on the 20th of June, 1884, Norton had more than a two-thirds interest in certain of the property, including the Dickens mine, described in the complaint, or that defendant has received, from the sale of trust property, an amount of money in excess of the debts of Norton, or that he has any trust money in his hands, or that he has mingled such money with his own. By way of further answer it is alleged that the defendant himself had a mortgage on two-thirds of the Charles Dickens mining property in the sum of $20,000 and interest, and that W. S. McCornick had a mortgage on the other third; that by foreclosure proceedings instituted in Custer county, Idaho, where the Dickens mine was situate, by

others than the defendant, Dooly, the Dickens property was, on the 15th of February, 1886, charged, by the judgment of the court, with various liens, among them the mortgage lien of the defendant amounting to $25,610.41 on two-thirds of said premises, and another such lien in favor of W. S. McCornick for $22,368.77 on the other third thereof, and thereupon such property was ordered sold to satisfy the several incumbrances; that the defendant herein filed an answer in each of the several foreclosure proceedings which were brought against him individually and as executor of the estate of William A. Norton, deceased, but were dismissed as against him as executor, and prayed that, if the court should order a sale of the premises, the amount due on his mortgage should be first paid out of the proceeds arising out of the undivided two-thirds of the Dickens property; that the decree of sale permitted the parties to those actions, including the defendant, Dooly, to bid and become purchasers at the sale; that on the 21st of July, 1886, the Dickens property was sold pursuant to the decree of the court; that at the sale two-thirds of the property was purchased by the defendant for $28,000, which was less than the amount of his claim, and the other third by McCornick for $24,000, both purchases having been made through R. C. Chambers, as trustee for the defendant and McCornick; that the purchase for defendant was so made that his interests as an individual and as trustee might be severed; that thereafter, on or about the 10th of April, 1887, the defendant, holding the two-thirds interest in the Dickens property freed from the trust, sold the same, through his trustee, Chambers, and received a certain sum therefor, which was not subject to any trust; and that the defendant, as trustee, was forced to expend large sums of money in protect-

ing the trust property, and in defending various lawsuits involving the same. It is further alleged in the answer that on June 20, 1884, Norton made and published his last will as a part of the same transaction as said deed, and appointed the defendant as his executor; that on the 15th of July, 1884, the testator died, and thereafter, upon the will being admitted to probate, the defendant qualified as such executor, and notice to creditors was published as required by the laws of Idaho; that his letters testamentary were not revoked until June 26, 1886; that the plaintiff Rohrer presented no claim for allowance, and that the plaintiff Hamilton presented his claim, which was not allowed.

The proof shows that the principal property involved in this controversy is the Charles Dickens mine and mill site, which is situate in Yankee Fork mining district, Custer county, Idaho. William A. Norton, deceased, was the locator of the mine, and after location conveyed a one-third interest therein to the plaintiff Rohrer, and one-third to Fred Phillips, who conveyed his third to J. D. Wood. Afterwards Rohrer and Wood conveyed their interests to Norton to enable him to sell the mine. Norton, Rohrer, and Phillips were the locators of the mill site, and Rohrer also conveyed his interest therein to Norton. On the 23d of February, 1883, after obtaining the deeds from Rohrer and Wood, Norton mortgaged the two-thirds thus conveyed to him to defendant, Dooly, for $20,000. He had previously mortgaged his other third to W. S. McCornick for $15,000. At the time the mortgage was given to Dooly, a sale of the property was pending. Norton gave Rohrer and Phillips each $3,000 in cash, and a note for $47,000, so that, in case of sale, or if Norton failed to reconvey to them,— for it seems the deeds of Rohrer and Wood were exe-

cuted to Norton to facilitate a sale, the property to be reconveyed in the event of failure to sell,—then they would have something to show their interests. While it is not clearly shown, yet it is apparent that Wood acted merely as agent in conveying the title of Phillips to Norton. On the 26th day of March, 1884, Norton mortgaged the whole mine to George L. Shoup for $14,585.85. On June 20, 1884, while sick in the hospital at Salt Lake City, Norton, by deed absolute on its face, and without consideration, conveyed the Dickens mine and two-thirds of the mill site, with other property, to the defendant, Dooly. This conveyance was made in trust, by oral agreement of the parties, as admitted by the grantee, to sell the property, and out of the proceeds pay the debts of the grantor, a reasonable compensation to the trustee, and the balance to the grantor or his devisees under his will. At the same time the grantor made his last will, and appointed the grantee as his executor. On July 15, 1884, Norton died. His will was then probated, and the defendant qualified as executor, assumed his duties as such, and took possession of the property. Soon after Norton's death, and within a short time after the execution of the deed and the making of the will, the defendant received under the trust, from the banks of which he was manager, the sum of $601.72, and then from the sale of provisions on hand at the mine $71.85, and from sale of salt $225; amounting to $898.85. From a sale of ore at the mine to R. C. Chambers he received on July 15, 1886, $3,254.12. The defendant testified that at the time of the sale of the Dickens mine, which occurred on July 21, 1886, he had expended $1,380.23. This sale was made under a decree of court as a result of 17 different suits brought in Idaho by miners claiming liens on the property

against defendant, Dooly, personally and as executor. They were all consolidated by order of court. The suit against him as executor was then dismissed. The defendant herein answered therein, contesting the liens, and praying that, if the property should be sold, he might have the benefit of his mortgage, as a prior lien upon the property. McCornick intervened, and set up his mortgage. Shoup was not a party to the litigation. In its decree in the consolidated suit the court, after giving liens of miners amounting to about $2,000 priority, allowed Dooly's mortgage lien upon two-thirds of the property and McCornick's upon one-third, and ordered the property to be sold to satisfy these various liens. The decree permitted any of the parties to bid and become purchasers. At the sale, John A. Marshall appeared as attorney for defendant, Dooly, who sent him $2,000, and McCornick sent him $1,000, and $100 was furnished him for expenses. R. C. Chambers, as trustee, bid $24,000 on one-third of the property, for McCornick. and $28,000 on two-thirds thereof, for Dooly, which was less than the amount of Dooly's claim. The entire bid was $52,000. The amount paid for liens was $2,349.35, of which Dooly's share was $1,566.23. The whole amount of miners' liens was $19,737.80. It appears that no other cash was necessary or actually used in effecting the purchases by Chambers than the $3,000 sent to the attorney. The time for redemption having expired on January 21, 1887, and no redemption having been made, the property was deeded to Chambers by the officer who made the sale. This closed all right of record appearing in the name of Norton or Dooly as grantee of Norton. It appears during all this time negotiations were pending for the sale of the property to an English syndicate, through parties known as "promoters," and on

January 31, 1887, the defendant, through his trustee, Chambers, sold it to John A. Marshall, who was acting as agent or trustee for the syndicate. The purchase price was $250,000, and $50,000 of it was to go to the promoters. Sixty thousand dollars of this was paid in cash, and the balance in debenture bonds,—£38,000. The bonds were sold for 60 per cent. of their face value. After paying the promoters, defendant, Dooly, recognized the right of McCormick to one-third, and claimed two-thirds of the net proceeds for himself. Phillips, the holder of a $47,000 note, brought suit to recover his third, which was conveyed to Norton through Wood. It appears this suit was compromised, and that Phillips received in settlement of his claim £6,950 in debenture bonds. No reconveyance was ever made by Norton or his representatives or grantee to Rohrer or Phillips of his interests in the property, although the evidence tends to show that their interests were to be reconveyed, and the notes canceled, if the property was not sold by June 20, 1884. The accounts of defendant, Dooly, show that the expenses of the Phillips suit, and other expenses incurred respecting the property, both before and after the foreclosure suit, were charged against the trust estate. The claim of plaintiff Hamilton, who was a physician, was for professional services rendered Norton while living, and for embalming the body after death. This cause was tried in the district court, and on August 22, 1891, that court announced its decision, which was, in effect, merely an interlocutory order in favor of the plaintiffs, ordering that the devisees of Norton be made parties to the suit, and that findings be made and decree entered. The findings were not filed until January 10, 1894, and then, as conclusions of law, it was found, among other things, that the sale of the Dickens property

made by Chambers to Marshall, as trustee, was for the benefit of the trust fund; that the proceeds of the sale were received by defendant, Dooly, as trustee, to be accounted for as such; that this action be referred to a master with directions to ascertain the amount of money in defendant's hands as trustee, and the amount so remaining in his hands, after allowing all reasonable expenses of his trust, compensation as trustee, and all prior liens on the property paid by him; and also to ascertain the creditors of Norton entitled to the residue. On November 1, 1895, a different judge being on the bench, the defendant moved to amend the conclusions of law, and to dismiss the action. The motion was granted, and the conclusions were amended so as to determine that the proceeds received by Dooly from the sale to the syndicate were not trust funds, and that the plaintiffs were guilty of laches in prosecuting the suit, and in complying with the order of court respecting new parties, and then, on December 19, 1895, final judgment was entered in favor of defendant. Afterwards, on November 17, 1896, in one of the state district courts, a motion for a new trial was overruled, and thereupon the plaintiffs appealed from the final judgment so entered.

*Brown & Henderson* and *J. T. Morgan,* for appellants.

*Bennett, Harkness, Howat & Bradley, Marshall & Rayle* and *Dickson, Ellis & Ellis,* for respondent.

It is well settled that the doctrine of laches will be acted upon by the court for negligence or delay occurring after suit brought, as well as prior thereto. See *Severing* v. *Severing,* 10 Atlantic Rep. 193; *Johnson* v. *Standard Mining Co.,* 148 U. S. 260, 270; See generally on the subject of

15 UTAH—19

laches, *Richards* v. *McCall*, 124 U. S. 183; *Marsh* v. *Whitmore*, 21 Wall. 178, 185; *Badger* v. *Badger*, 2nd Wall. 95; *Gaddon* v. *Kimmel*, 99 U. S. 201.

"When the sale is made under the direction of a court of equity, by officers appointed by the court, it is not a sale by the trustee, and the rule forbidding him to purchase at his own sale has no application." Second Jones on Mortgages, sec. 1636; Snell's Equity, pp. 146, 156; 27th Am. & Eng. Enc., pp. 210, 212; Chorpenning's Appeal, 72 Am. Dec. 78–9; *Bothwell* v. *Coak's Law Reports*, 23 Chancery Division, 302; *Wright* v. *Ross*, 36 Cal. 414 (Read 445, 446); *Felton* v. *Le Breton*, 92 Cal. 457 (Read 465 to 467); *Newell* v. *Le Breton*, 119 U. S. 259.

(The facts relating to the trust and the sale thereunder in the case last cited, will be found fully stated in the case from 92 California above cited.) *Allen* v. *Gillette*, 127 U. S. 589; *Twinlick Oil Co.* v. *Marbury*, 91 U. S. 587, 590, 591; 9th Bush (Ky.) 468.

BARTCH, J., after making a statement of the pleadings and facts as above, delivered the opinion of the court:

It is contended for the respondent at the outset that the statement on motion for a new trial is not properly a part of the record on which the appeal was taken, because, as is insisted, notice of intention to move for a new trial was not served in time, as required by section 3402, Comp. Laws Utah 1888, and was defective. The statute requires the moving party to serve such notice within 10 days after notice of the decision of the court when the cause is tried without a jury. The question, therefore, is, when ought the notice to have been served? The first decision of the cause was announced on the 22d of August, 1891, and it was in favor of the plaintiffs. In line with that decision, which, in effect and in reality, was merely an interlocutory decree, the same

judge, on January 10, 1894, filed findings of fact and con-
clusions of law. Why these findings were not filed
sooner, does not appear, and, in the absence of any show-
ing to the contrary, this court must assume that there
was cause for the apparent delay. Nor does it appear
why the order making the devisees parties to the suit
was not made before May 20, 1895. Mere delay in the
proceedings of the court will not justify us in assuming
that it was wrongful, and without cause, in a case of this
character. During all this time, and until the 19th of
December, 1895, matters were favorable to the plaintiffs,
and they were not aggrieved, and had no occasion to
move for a new trial, before that date. Only the defeated
or aggrieved party has the right to make application
for and serve notice of motion for a new trial. Section
3400 Comp. Laws Utah 1888. On the last-named date,
however, the court, on motion of the defendant, filed
November 1, 1895, amended the conclusions of law filed
January 10, 1894, and entered a final judgment dismiss-
ing the plaintiffs' complaint. This was the first decision
in the cause adverse to the plaintiffs, and was a final
judgment, from which they had the right to appeal. On
the 28th of December, 1895, the plaintiffs filed and
served their notice of intention to move for a new trial.
As will be observed, this was within 10 days after the
final decision of the court, and in full compliance with
the statute. The point that the notice was defective,
because, as is said, it did not designate whether it was
made upon affidavit, or the minutes of the court, or bill
of exceptions, or a statement of the case, cannot avail
the respondent, in view of the stipulation made on the 9th
of June, 1896, wherein his counsel agreed that the state-
ment was full, true, and correct, and that the same
might be settled by the court, reserving the objection

only "that no statement was made within the time provided by law, and that no order of the court was obtained extending the time." At no time in the court below, so far as appears from the record, was there any objection made or reserved on the ground that the notice was defective or insufficient. Nor does it appear that the court considered any such objection in denying such motion. Under these circumstances the respondent must be held to have waived the objection now made to the sufficiency of the notice, and the statement be considered as properly a part of the record. *Gray* v. *Nunan*, 63 Cal. 220. The matters contained in the statement may be considered on appeal from the final judgment. *White* v. *Pease*, 15 Utah 170.

It is further insisted on behalf of the respondent that the plaintiffs were guilty of such laches in the prosecution of their suit as to justify the court in dismissing the complaint. No doubt it is the duty of every person who institutes legal proceedings against another to prosecute his suit with reasonable diligence, and he may forfeit his rights by a failure to so prosecute it. Bouvier defines laches as "negligence"; Anderson, as "neglect, negligence, default; inexcusable delay in asserting a right." It is such negligence as results in the omission to do what one is by law required to do to save a right, and which warrants a presumption that the claimant of it has abandoned it and declines to assert it. When the assertion of a right is neglected or omitted for a period of time more or less great, and under such circumstances as to cause prejudice to an adverse party, it may operate as a bar in equity. Although an important ingredient in the law of laches, the instances seem to be rare where courts have declared that mere lapse of time might effect a positive bar, even in cases of purely equitable

jurisdiction; while, on the other hand, relief has frequently been granted, notwithstanding great delay, when substantial justice could yet be done between the parties. 12 Am. & Eng. Enc. Law, 540-542. This is a salutary and beneficial law, and, like the principle of limitation, was dictated by experience, and founded in wisdom. It discountenances stale demands, requires promptness in the establishment of a claim, and thereby promotes the peace, repose, and welfare of society. While it warns against such lapse of time as destroys the muniments of evidence and other proof, by carrying with it the memory and lives of witnesses, still the rule which gives it effect should not be so applied as to make it an instrument of oppression. When, therefore, the parties remain in the same relative position, and the delay has worked no serious wrong to the adverse party, so that justice can still be done, the claimant should not be refused relief on the ground of laches. So, likewise, where the delay was caused by, or may properly be attributed to, the acts of the party insisting on the bar. Whether, therefore, one has slept on his claim so long as to be estopped from asserting it must depend upon the particular facts and circumstances of each case. In *Daggers* v. *Van Dyck*, 37 N. J. Eq. 130, Vice Chancellor Van Fleet said: "It is only when the complainant has slept over his wrongs so long that, even if relief be given to him, great and serious wrong will be done to the defendant, that laches constitute a complete defense." In *Wollaston* v. *Tribe*, L. R. 9 Eq. 44, where, in 1868, a bill was brought to set aside a marriage settlement executed in 1858, on the ground of fraud and mistake, Lord Romilly, M. R., said: "Great stress was laid on lapse of time; but I think nothing of that, because all the persons interested are in the same state now as

they were then. If there had been any dealing which
had altered the state of matters, that might have raised
a question; but there is nothing of the sort." 12 Am. &.
Eng. Enc. Law, 533–535, 544; *Nudd* v. *Powers*, 136 Mass.
273; *Nelson* v. *Carrington*, 4 Munf. 332; *Gibbons* v. *Hoag*,
95 Ill. 45; *Coles' Adm'r* v. *Ballard*, 78 Va. 139; *Paschall* v.
*Hinderer*, 28 Ohio St. 568; *Wissler* v. *Craig's Adm'r*, 80 Va.
22; *Brown* v. *County of Buena Vista*, 95 U. S. 157; *Ex parte
Adamson*, 8 Ch. Div. 807, 817; *Platt* v. *Platt*, 58 N. Y. 646.

Viewing the case at bar, as disclosed by the record,
in the light of these principles, were the plaintiffs guilty
of such negligence in the prosecution of the action as to
preclude their recovery on the ground of laches? With-
out stating the facts and examining the history of the
case in detail, it is clear that this question must be
answered in the negative. It is true the cause was tried,
and the interlocutory decree entered, in 1891, and the
findings were not filed until 1894; but what is there to
show that the plaintiffs caused the delay? There is no
proof of facts or circumstances which impute negligence
to them in this regard, and we cannot presume negligence
where no facts appear which warrant us in so doing.
In fact, the presumption growing out of the principles
of human nature as developed in experience is that men
will use reasonable diligence to obtain their rights.
Observation teaches us that persons are more likely, in
their haste, to assert a groundless, and consequently
false, claim, than to retard proceedings to enforce a just
and lawful one. Considering the crowded condition of
the docket during the proceedings of this case in the
territorial district court, the record of which we may
take judicial notice, it could hardly do violence to any
principle of justness and fairness to presume, in the
absence of proof to the contrary, that the delay was

caused by the court being engaged in the trial of causes having preference in point of time, or possibly through dilatory tactics of the defendant himself. So, the delay in making the devisees of the testator parties to the action, for aught that appears from the record, may have been owing to an impossibility of learning where they lived. However these matters may be, there is nothing in the record to justify a holding that the laches of the plaintiffs constitute an absolute bar to the further prosecution of their suit. Nor is the conclusion of law declaring the plaintiffs guilty of laches, found by the court that entered the final judgment against them, supported by the proof, and yet laches always depend on the facts peculiar to the case. What may be considered neglect in one case may be regarded as reasonable diligence in another. It does not appear that the controversy is seriously embarrassed by the loss of evidence or otherwise. Nor is it shown that the defendant's rights have been prejudiced by the delay. The parties are about in the same situation as they were when the suit was commenced. Under all the circumstances of this case, we are of the opinion that the lapse of time in the prosecution of the suit constitutes no bar to relief in equity, and that the action of the court respecting laches was unwarranted.

The most important question in the case is whether the defendant, Dooly, having become the purchaser at the foreclosure sale of two-thirds of the Dickens mining property, purchased and had the right to hold it discharged of any trust. It is admitted that Norton conveyed the property to him in trust to convert the same into money, pay the debts of the grantor, a reasonable compensation to the trustee, and the balance to his devisees, and that, after Norton's death, Dooly became

the executor of his estate; and it is therefore strenuously contended by counsel for the appellant that Dooly purchased the property as trustee, not for his own benefit, but for that of the *cestuis que trust,* and that, as he afterwards sold it to the English syndicate at a profit, he is bound to account to the beneficiaries for the proceeds of that sale. Counsel for the respondent with equal vigor insist that, because of his interests in the property as mortgagee, the purchase by Dooly at the foreclosure sale vested in him an indefeasible title, for his own benefit, freed from the trust, and that, therefore, he is not required to account for the proceeds of the subsequent sale, either as executor or trustee. The sale of the other third of the mine to McCornick is not questioned. Nor has there been an attempt to set aside the subsequent sale to the syndicate. The plaintiffs appear to be satisfied with that sale, but demand an accounting. The real controversy is, therefore, over the profits of the last sale, and the rights of the creditors and devisees of the deceased respecting the same. When the defendant accepted the trust under the conveyance from Norton, he at once became charged with the duty of managing and disposing of the property in a careful and prudent manner for the benefit of the *cestuis que trust.* The property became a trust fund, and could not be diverted from the objects of the trust. His duty in relation thereto was imperative, and the fiduciary relation which thereafter existed between him and his beneficiaries made it impossible for him to lawfully gain any peculiar advantage or benefit to himself out of the trust estate. Under such a trust the trustee is absolutely prohibited from speculating with the trust funds; and, if he does, and loses, the loss is his, and, if he gain, the gain belongs to the *cestuis que trust.* If the property be sold under the trust, the

law requires that it shall bring the highest price reasonably obtainable for it, and that the trustee shall retain a position which will enable him to procure such price. This brings the trustee directly within the reason of the policy which, on account of the possible clashing of interests, forbids that he shall become a purchaser of trust funds for his own benefit. This is a prohibition which is not confined to him who, through his personal efforts, effects the sale, but it extends to all who, by operation of law or act of a party, stand in a fiduciary relation to the subject of the trust, which they cannot cast off at mere pleasure, to assume some position hostile to the interests of the *cestuis que trust*. A person in such a situation cannot be permitted to act up to the time of the sale, obtain all the information useful to him, and then shake of his character as trustee, and become an unconditional purchaser of the property. He can only be permitted to become such purchaser upon having ceased his relations as trustee by consent of the *cestuis que trust*, after full information freely given. *Ex parte* James, 8 Ves. 337, 352.

The disqualification embraces also all such persons as are employed and concerned in the affairs of another, and who, because of position, possess means of information which might be used in a manner hostile to the interests which it is their duty to promote. Where a trustee, however, purchases trust property at a sale, the purchase is not absolutely void, but voidable merely, at the option of those who are beneficially interested, and he takes the property subject to the equities of the *cestuis que trust*, who, within a reasonable time, may call upon him to account for the proceeds or profits, or have a resale, or may avoid the sale. *Fisk* v. *Sarber*, 6 Watts & S. 18; *Whichcote* v. *Lawrence*, 3 Ves. 740. If it were

otherwise, infinite mischief would, in many cases, be the sequence, because, as has been learned from experience, the frailties of human nature are such that he who has the power will usually be seized with the inclination to use his information to benefit himself, even at the expense of those whose interests he is in law and duty bound to foster. Respecting this the maxim is *" Emptor emit quam minimo potest, venditor vendit quam maximo potest."* If the trustee were to purchase the trust property for his own benefit, it would be to his interest to purchase at the lowest price possible, while it would be to the interest of the *cestuis que trust* to sell at the highest procurable price. This would create a conflict of interests in contravention of the policy of the law. To avoid such conflict, it is well established, as a general rule, that a trustee, or person acting in a fiduciary relation, shall not become an unconditional purchaser of property subject to the trust, or acquire an indefeasible interest therein, without the consent, given after full information, of those for whose benefit he has undertaken to act. This rule, in the language of the learned commentator on American law, is founded on the danger of imposition, and the presumption of the existence of fraud inaccessible to the eye of the court. Its policy is to shut the door against temptation, which, in cases where the relationship before adverted to exists, is of itself deemed to be sufficient to create the disqualification. 4 Kent, Comm. 438. And courts of equity will not be misled, in the application of the rule, by any attempt of the purchasing trustee to show that no fraud was committed, and to establish the fairness of the purchase. Whether fraud exists or not makes no difference. The object of the rule is to secure fidelity on the part of the trustee, and to guard and pre-

serve the interests of the *cestui que trust*. Hence equity makes no inquiry for fraud respecting the purchase, but removes the temptation by declaring him who has assumed the fiduciary relation incapable of making a purchase which will bind the beneficiaries of the trust, and gives them the option to affirm, or within a reasonable time to set aside, the sale, and, in case of affirmance, to require an accounting for the profits. And it is immaterial whether the sale at which the purchase is made is public or private or judicial. In Story, Eq. Jur. § 307, the learned author observed that in these cases "there is often to be found some intermixture of deceit, imposition, overreaching, unconscionable advantage, or other marks of direct and positive fraud." But the principle on which courts of equity act in regard thereto stands, independent of any such ingredient, upon a motive of general public policy; and it is designed in some degree as a protection to the parties against the effect of overweening confidence and self-delusion, and the infirmities of hasty and precipitate judgment. In *Van Epps* v. *Van Epps*, 9 Paige 238, a person holding a subsequent mortgage for the benefit of others attempted to purchase the land mortgaged for his own benefit at a foreclosure sale under a prior mortgage. It was held that the act of purchasing was inconsistent with his duty as a trustee, and that he could not purchase to the prejudice of the *cestui que trust*. In the course of his opinion, Chancellor Walworth said: "It is a rule which applies universally to all who come within its principle; which principle is that no party can be permitted to purchase an interest in property, and hold it for his own benefit, where he has a duty to perform in relation to such property which is inconsistent with the character of a purchaser on his own account and for his individual use."

And again he said: "In cases of this kind the court does not suffer itself to be drawn aside from the application of the equitable rule by any attempt on the part of the purchaser to establish the fairness of the purchase." So in *Ex parte Lacey*, 6 Ves. 625, where the charges were against assignees under a commission of bankruptcy, one of whom was a banker, into whose bank the money was paid, and another was the purchaser of a part of the bankrupt's estate, sold under the commission, Lord Eldon observed: "The rule is this: A trustee who is intrusted to sell and manage for others undertakes in the same moment in which he becomes a trustee not to manage for the benefit and advantage of himself. It does not preclude a new contract with those who have intrusted him. It does not preclude him from bargaining that he will no longer act as a trustee. The *cestuis que trust* may, by a new contract, dismiss him from that character; but even then that transaction by which they dismiss him must, according to the rules of this court, be watched with infinite and the most guarded jealousy; and for this reason: that the law supposes him to have acquired all the knowledge a trustee may acquire, which may be very useful to him, but the communication of which to the *cestuis que trust* the court can never be sure he has made when entering into the new contract by which he is discharged." And this doctrine is not inconsistent with the position assumed by Lord Alvanley in *Campbell* v. *Walker*, 5 Ves. 678, that "there is no rule that a trustee cannot be a purchaser; but, however fair the transaction, it must be subject to an option in the *cestui que trust*, if he comes within a reasonable time, to have a resale." In *McGinn* v. *Shaeffer*, 7 Watts 412, Mr. Justice Sergeant, delivering the opinion of the court, said: "It is not sufficient for a party who has been clothed with a fiduciary character

to intrench himself in forms of law. Equity follows his character throughout, and clothes him with it, notwithstanding his endeavors to shake it off in order that he may enjoy the advantages derived from that character, to the injury of others for whom he has acted. * * * There is but one recognized path for a trustee to walk in, and that is that all his views and conduct be directed to a faithful discharge of his duty as such; and where his acts may admit of two constructions, one rightful, the other tortious, in respect to his *cestui que trust*, equity will choose the former, and reject the latter."

The case of *Bennett* v. *Austin*, 81 N. Y. 308, was an action to have a quitclaim deed declared to be a mortgage, and for an accounting and redemption. From the facts it appears that as security for advances made to the firm of Bennett & Avery the members thereof executed to Stephen G. Austin a quitclaim deed to their interests in certain premises, upon which were two elevators. Previously, the firm and other owners of elevators had entered into an agreement with the Western Elevating Company, and nominally leased to it their elevators; they, however, to retain possession and operate them, and the profits to be divided among the owners. The firm had also assigned their share in the profits to the holders of a prior mortgage, to be applied in liquidation of the debt secured by the mortgage and other prior incumbrances. Austin, although aware of this arrangement, afterwards, by setting up his apparent title, without the consent of the firm or of the mortgagees, induced the company to cancel the former agreement, and substitute a new one with him as the owner of the elevators, and thereafter received and retained the dividends. Thereupon the mortgagees, making Austin a defendant, foreclosed, and by an arrangement with them Austin, at the sale, pur-

chased the property for the amount of their judgment. After his death, in the action to have the quitclaim deed declared a mortgage, and to redeem, Lavinia Austin, widow and devisee of the deceased, was defendant. The court, among other things, held that the defendant in equity could not avail himself of the title obtained at the foreclosure sale to defeat the plaintiff's equity of redemption; that when Austin received the dividend in the manner specified he became *ex maleficio*, constructively, a trustee of the fund; that under the law it was his duty to apply the dividends to the purposes for which they had been appropriated; and that he had no right, in violation of that duty, to become a' purchaser for his own benefit. Mr. Justice Miller, in the course of his opinion, remarked: "Austin then bid off the property, and took the title in his own name. This bid was not personal for himself, but for the benefit of the trust he represented. He could not be a trustee before the sale, and immediately afterwards a stranger to the trust. A trustee cannot thus get rid of his obligation, discharge the trust, and reap the advantages of a sale for himself individually. It is but just to remark that it does not necessarily follow that he purchased and took the conveyance for the purpose of defrauding Bennett & Avery. As trustee, it may have been consistent with his duty to clear up the title, and get rid of junior incumbrances. He had a right to purchase in this form, but he could not buy for his own benefit." That case, it will be noticed, was, in many respects, similar to the one at bar. The principles hereinbefore mentioned and considered, as may be observed upon examination of the authorities herein referred to, have frequently been applied to this class of cases, both in England and in this country. *Ex parte Bennett,* 10 Ves. 381; *Jewett* v. *Miller,* 10 N. Y. 402; *Iddings* v. *Bruen,* 4 Sandf.

239, 281; *Ex parte Reynolds,* 5 Ves. 707; *Ex parte Hughes,* 6 Ves. 617; *Arnold* v. *Brown,* 24 Pick. 89; *Beeson* v. *Beeson,* 9 Pa. St. 279; *Randall* v. *Errington,* 10 Ves. 423; *Davoue* v. *Fanning,* 2 Johns. Ch. 252; *Conger* v. *Ring,* 11 Barb. 356; *Wistar's Appeal,* 54 Pa. St. 60; *May* v. *Le Claire,* 11 Wall. 217; *Slade* v. *Van Vechten,* 11 Paige 21; *Janes* v. *Throckmorton,* 57 Cal. 368; *Sanderson* v. *Walker,* 13 Ves. 601; *Hermstead's Appeal,* 60 Pa. St. 423.

The transaction, in legal effect, is the same, and the general rule applies, whether the purchase is made by the trustee himself, for his benefit, or through the intervention of a third party, as trustee or agent for him, or whether he makes the purchase as agent for some other person, because one who is incapacitated to purchase for himself cannot buy as agent for another. *Ex parte Bennett, supra; Hawley* v. *Cramer,* 4 Cow. 717.

Having thus considered the principles which apply to trustees, or those holding fiduciary relations to others, it now becomes important to determine whether, under the facts and circumstances disclosed by the record, the case at bar falls within the prohibition of the general rule, or whether defendant, Dooly, had shaken off his relation as trustee, and made the purchase discharged from the trust. In the first instance he took upon himself the duties of a trustee by accepting the deed from Norton. These duties required him to sell the property to the best possible advantage, and out of the proceeds to pay Norton's creditors, including the defendant as mortgagee, and, after paying the expenses, and paying the trustee a reasonable compensation for services, turn the balance over to the devisees. After conferring this trust, Norton died, and then Dooly became executor of the estate. He immediately assumed control of the property, and was placed in a position to obtain, through his

own efforts and those of employés and agents, valuable information respecting the mine, and the negotiations of sale which had been in progress. The actions to establish miners' liens were commenced in Idaho, and consolidated in the foreclosure suit, and Dooly answered, contesting the claims, and praying that, if the court should order a foreclosure, his mortgage might be declared a prior lien. Liens amounting to about $2,000 were declared to be superior to the mortgage liens of McCornick and Dooly, the sale was ordered, and Dooly bought the property in controversy, paying, as it appears, on account of prior liens, $1,566.23, which, excepting expenses of sale, was all the actual cash used and necessary at the time of the purchase. Dooly bid $28,000, which was less than his claim, for two-thirds of the property,—being that in dispute,—and McCornick bid $24,000 for the other third, the entire bid being $52,000, to cover the superior liens. The accounts of the defendant show that all the expenses respecting the property, including those incurred in defending the various lawsuits, and of sale, as well as the prior liens, were paid out of the trust fund. Dooly himself testified that up to the time of the sale he had paid in expenses $1,380.23, and his accounts show that from various sources he had received $898.85, and from sale of ore at the mine $3,254.12, all of which belonged to the trust fund. It is therefore clear that the money used in making the purchase was actually a part of that fund; and the fact that $2,000 was sent to the place of sale for the purpose of the purchase, simply shows accuracy of information as to the amount required, and does not divest it of its character as trust money. Nor did the fact that the purchase was made by Chambers, as trustee for Dooley, divest the transaction of its fiduciary character. As we have seen, one who is incapable of purchasing for

himself cannot buy through the intervention of a third person. In the meantime the negotiations for the sale of the property were going on, and finally resulted in the sale thereof by the defendant to the English syndicate, within 10 days after the period for redemption had expired, at a purchase price of $250,000, two-thirds of which being for the property in question.

Further reference to the evidence would not be profitable, because it is evident that the defendant made the purchase in his character as trustee, for the benefit of the *cestuis que trust*, and must be held to account for the profits made by the subsequent sale. It is true that he was a mortgagee, and was not instrumental, in the first instance, in bringing about the foreclosure sale; but this gave him no such interest in the property as to alter his position as trustee or permit him, without the consent of the *cestuis que trust*, to assume an attitude whereby his own interests might be opposed to the interests of those for whom he had undertaken to act. Equity will not open the door to any such clashing of interests. A mortgagee who is also a trustee is bound to fulfill his trust with the same fidelity as if he were not a creditor. Nor could the defendant act as trustee up to the time of the sale, then disrobe himself of his fiduciary character, and, with the information obtained while in the trust relation, gain an advantage to himself. Nor could the court of Idaho confer upon him any power to so gain such advantage by dismissing the suits against him as executor. As mortgagee his rights were in no way impaired by the sale. His situation was just the same after as before. He still had the right to payment out of the property, but he had no right to speculate with the trust fund, and therefore it was his duty to account to the *cestuis que trust* for the profits of the sale to the syndi-

15 UTAH—20

cate. Failing to do this, a cause of action accrued to the plaintiffs to enforce payment of any lawful claims to the extent of the money so held in trust by him; and the plaintiff Rohrer, having an equitable claim or interest in the property, could bring suit against the trustee without first presenting the claim to the executor for allowance. Rohrer is not seeking to recover an ordinary debt against the estate, but to enforce his rights to the trust funds which found their way into the hands of the executor, who is also trustee. He was not, therefore, a creditor within the meaning of the probate laws. *Gunter* v. *Janes*, 9 Cal. 643.

Counsel for the respondent also rely on the provision in the decree of foreclosure which authorizes any party to bid at the sale. A provision of this character is common in such decrees, but it was never intended for the purpose of permitting a trustee, who is a party to the suit, to bid in the trust property for his own benefit. It is usually inserted to avoid the supposed technical rule that a party to a suit cannot become a purchaser, under the decree therein, without special permission. In *Fulton* v. *Whitney*, 66 N. Y. 548, Mr. Justice Rapallo said: " Such a provision, in foreclosure cases, is usually inserted for the purpose of removing any doubt as to the right of the complainant who conducts the suit and the sale to become the purchaser. If the purchaser, though a party to the action, is acting in a fiduciary capacity arising outside of the relation of mortgagor and mortgagee, his liability to his *cestuis que trust* cannot be affected by such a provision, nor by the order confirming the sale." *Bennett* v. *Austin, supra; Torrey* v. *Bank*, 9 Paige 649.

Doubtless a trustee may, when the circumstances of the case warrant it, make special application to a court of equity, stating why it would promote the interests of

his *cestuis que trust* to permit him to purchase and hold property of his beneficiaries freed from the trust. His statements then can be judicially investigated, and, if determined in his favor, under a decree therefor, he may purchase and procure an indefeasible title; but this is a different thing from permitting him to purchase under the usual clause inserted in an ordinary decree of foreclosure. *Gallatian* v. *Cunningham,* 8 Cow. 361; *Campbell* v. *Walker,* 5 Ves. 678.

Counsel for the appellants insist that the defendant was guilty of actual fraud. However this may be, it is unimportant to consider this question, because it is not a necessary ground for relief. However innocent and fair the purchase, it was vicious in its consequences, and the *cestuis que trust* were neither bound to allege nor prove, nor was the court bound to determine, that the trustee was guilty of fraud, or made a bargain advantageous to himself. For the purposes of this suit it may be assumed that the purchase was not tainted with fraud, and still the plaintiffs are not bound by it. Fraud may exist, and yet not be susceptible of proof. To guard against this hazard and the violation of duty, and to remove the trustee from temptation, equity imposes upon him the disqualification of becoming a purchaser of the trust property for himself, without the consent of his *cestuis que trust,* and thus the rule destroys the very root of the evil. *Whelpdale* v. *Cookson,* 1 Ves. Sr. 9; *Case* v. *Carrol,* 35 N. Y. 385; *Davoue* v. *Fanning, supra; Fulton* v. *Whitney, supra.*

It is not deemed necessary to make a special analysis of the cases cited by counsel for the respondent, because a careful examination of them satisfies us that they cannot be regarded as controlling authority in the case at bar. In none of them do the essential and decisive facts appear to be the same as, or even similar to, those herein.

We are of the opinion that as the respondent, outside of his relation as mortgagee, was a trustee of the property, he did not, under the facts and circumstances revealed by the record, acquire an unimpeachable title by his purchase, and that, therefore, he must be required to account for the profits of the subsequent sale to the syndicate. The cause is reversed and remanded, with directions to the court below to set aside the judgment of dismissal, grant a new trial, and proceed in accordance herewith. It is so ordered.

MINER, J., and HILES, District Judge, concur.